BYRON O. CARR, Appellant, v. WHITEBREAST FUEL COMPANY *et al.*, Appellees.

1. **Lease of Coal Land**: MUTUAL MISTAKE: CONSTRUCTION. The plaintiff leased to the defendant, for coal mining purposes, a large tract of land in Lucas county, from January 1, 1880, until the latter should be able, in prosecuting its business with the diligence required by the lease, "to remove all the available and merchantable and salable coal to be found therein." The defendant was to pay the plaintiff an agreed royalty per bushel upon all coal taken from his land, and was given the right to take coal from adjoining lands through the shafts sunk upon the leased premises, but it was agreed that the defendant should conduct the principal business of its mining in Lucas county on and from said premises, and that it would mine therefrom a "majority" in bushels and weight of all the coal that it should mine in said county from year to year. Both parties believed when the lease was made that the leased land abounded in coal, but this proved to be a mutual mistake. The defendant used due diligence in discovering and mining the available coal found on the land, and it paid the plaintiff in full the royalty on the coal mined. The coal so mined was for several years a "majority" of all the coal mined by the defendant in Lucas county, but in later years, on account of the comparative failure of available coal on the leased land, the defendant could not make the coal taken therefrom a "majority" of all the coal mined by it in Lucas county without reducing its output from other lands in that county. *Held,* that the defendant was not required, in order to comply with the letter of the lease, to reduce its output from other lands, as such an agreement would be contrary to public policy, and therefore void; that, on account of the mutual mistake of the parties as to the amount of available coal in the land, the plaintiff

could not recover royalty on the difference between the amount of coal taken from his lands and that taken from other lands in the county; and that the defendant was not obliged to surrender the lease in order to avoid liability for royalty on such difference.

2. ———: ROYALTY: CHANGE OF SCREENS.  The lessee under said lease was to pay the lessor a stipulated royalty upon the clean, merchantable salable coal taken from the land, but no royalty upon nut, pea and slack coal.  The means used, at the time the lease was made, for separating the lump from the fine coal, including screens of a certain kind, were afterward found ineffectual for that purpose, and screens of another pattern were adopted.  *Held*, that the change of screens was authorized by the facts, and that, whether authorized or not, the lessor had no ground for complaint, in the absence of a showing that his royalty was reduced by the change.

*Appeal from Lucas District Court.*—HON. W. I. BABB, Judge.

TUESDAY, MAY 16, 1893.

ACTION in equity for an accounting, and to recover amounts alleged to be due under the provisions of a mining lease.  There was a hearing on the merits, and a decree for the defendants.  The plaintiff appeals. —*Affirmed.*

*C. C. Leech*, for appellant.

*T. M. Stuart* and *Wm. McNett*, for appellees.

ROBINSON, C. J.—On the thirteenth day of June, 1874, the plaintiff leased five hundred and forty acres of land in Lucas county, which he then owned, to William Haven.  The lease was for the term of five years, and gave to the lessee the right to prospect for, and mine and remove from the leased premises, coal and other minerals, together with certain privileges for the purpose of carrying on mining operations, which need not be enumerated.  The right to purchase the leased premises at the end of five years, at a price to be then fixed, or to elect to extend the lease for a period of

twenty years at a rate of royalty not exceeding one-half of one cent per bushel for merchantable coal mined, was given to the lessee.   An undivided two-thirds of the rights conferred upon Haven by the lease were afterwards assigned to J. C. Osgood and L. R. Fix, and at a later time all the rights of the three persons last named, held under the lease, were transferred to the Whitebreast Coal & Mining Company.   Coal was found on the leased premises, which are sometimes described as the "Carr Land," and in the year 1876 a shaft was sunk west of, and near to the west boundary line of, that land, entries were run into it, and the mining of coal therefrom was commenced in the summer of that year. Operations under the Haven lease were continued until the seventeenth day of February, 1880, when the one in controversy was executed by the plaintiff to the Whitebreast Coal & Mining Company for the premises included in the first lease.   A copy of the second lease is as follows:

"This memorandum of agreement, made and entered into on this seventeenth day of February, A. D. 1880, by and between Byron O. Carr, of Louisville, Ky., party of the first part, and the Whitebreast Coal & Mining Company, of Burlington, Iowa, party of the second part, witnesseth, that for and in consideration of the covenants and agreements hereinafter contained, to be performed by the party of the second part, and of the further sum of one (1) dollar in hand paid, the receipt wherof is hereby acknowledged, the party of the first part does hereby demise and lease unto the said party of the second part the following described real estate, situate and being in Lucas county, in the state of Iowa, to wit:

"The northwest quarter of the northeast quarter, the south half of the northeast quarter, the south half of the northwest quarter, the north half of the southwest quarter, the northeast quarter of the southeast

quarter, the south half of the southeast quarter, in section eighteen (18), and also the northwest quarter of the northeast quarter, the south fractional part of the northeast quarter of northwest quarter, in section nineteen (19), and also the southwest quarter of the northwest quarter, and the north fractional part of the northwest quarter of the southwest quarter, in section seventeen (17), all being in township seventy-two (72) north, and range twenty-two (22) west of the fifth principal meridian, and containing five hundred and forty (540) acres, more or less; to have and to hold the same for a term beginning the first day of January, A. D. 1880, and continuing until, in mining and operating its mining business with the diligence and in the manner hereinafter provided, the party of the second part shall be able to mine and remove all the available and merchantable and salable coal to be found therein, and for the said purpose of mining said land, and other purposes, and subject to the following terms, conditions, and provisions, as the same are hereinafter specified and set forth:

"Said party of the second part is hereby granted and invested with the exclusive right and privilege during the existence of this lease, and for the term or period hereinafter provided, of mining, taking out, and removing all the available coal in and under said lands, and the ownership and right to said coal when mined, and of removing from said lands said coal, and any other mineral that may be found thereunder, and to that end the said party of the second part shall also have the exclusive right to sink air, water, and hoisting shafts, and exclusive right of way for side tracks, and the right to cut, remove, and use the growing timber upon said lands, necessary for mining purposes, also the right to prospect for coal in the usual manner. In addition to said mining right and privilege, said party of the second part are hereby granted and invested with

the actual possession and use of the surface of all that portion of said lands which are situated north of the C., B. & Q. railroad, as now located and constructed, during the term of this lease, and with the right to sublet the same in whole or in parts.

"Said party of the second part are also granted and invested with the actual use and possession of not to exceed four (4) acres at and around any shaft or shafts which said party may sink on any portion of said land south of said railroad track, and the right to sublet the same, in whole or in part, for dwelling and agricultural purposes, or for stores; and the limits and boundaries of said parcels are to be selected and designated by said party of the second part, in writing, to the party of the first part.

"Said party of the second part are also to have the right of way over and across said land south of said railroad to and from any shaft or shafts sunk on said lands, and the exclusive right of way for side tracks on said lands south of said railroad during the continuance hereof.

"It is further agreed and provided that said party of the second part shall have the exclusive right to move, transport, and carry over and across any of said lands thus leased, either upon the surface, on tracks or right of way, or through the mines, or subterranean tracks, or otherwise, on said land, any coal owned by said company, taken and mined on other lands, or any material which may be necessary and useful in conducting the mining operations of said party of the second part, during the continuance of this lease.

"It is agreed and understood that said party of the second part shall not impair or injuriously affect the surface of said land south of said railroad, except as shall be necessary in the management and prosecution of their mining operations and business; it being expressly understood that said party of the first part

reserves the right to use, occupy, and lease and sell subject to this lease, for agricultural purposes, all said lands south of the railroad, except such tracts as may be selected by the parties of the second part around the shafts. But it is expressly provided that neither said party of the first part, nor his heirs and assigns, shall interfere with or obstruct the working and operation of said mines by the party of the second part.

"Said party of the second part shall use the timber grown upon said lands for the building or covering of shafts, and other purposes connected with and incident to said mining, but not for the erection of buildings, ties for side tracks, or for general purposes. This right shall not extend to any timber planted and grown upon said premises hereafter.

"The provisions of this lease do not require the lessee to sink any shaft or shafts, but that is left to depend upon its own consideration.

"For and in consideration of the said premises, said party of the second part hereby covenants and agrees to pay to the said party of the first part, his heirs or assigns, in quarterly payments, a royalty of one-fourth of one (1) cent per bushel of the same weight as paid for to miners, for all clean, merchantable coal, or for all salable coal, taken out the preceding quarter, but nut, pea, and slack coal to be free of royalty; said royalty to be payable at the First National Bank of Burlington, Iowa, or such other place in the city of Burlington, Iowa, as the said party of the first part shall indicate and request in writing. Said quarterly settlements shall occur at the close of the months of March, June, September, and December of each year, and the payment of said royalty on or before the fifteenth of the month following such quarterly settlement.

"It is further agreed, and this lease is upon this inducement, and of its essence, that the said party of

the second part will, during the entire term of this lease, vigorously, diligently, and in good faith, without evasion, prosecute its mining and coal business in Lucas county so as to increase and promote that business as far as practicable; that it will faithfully, and without evasion, conduct the principal business of its mining in said county of Lucas on and from the lands herein mentioned and described, and that said party of the second part will take and mine from said land a majority in bushels and weight of all the coal that is by said party of the second part mined in said county of Lucas in each and every year; but, when the amount of coal taken from the lands herein described shall aggregate two hundred thousand (200,000) tons per annum, then, and so long as such quantity, two hundred thousand (200,000) tons, shall be mined from said land annually, said party of the second part's right to mine from other lands shall be unlimited. Nothing in this clause shall prevent or deprive the party of the second part from supplying their contracts and the market with coal from other lands during such time as the coal in the mines of the lands herein described shall be unavailable, in consequence of any unforeseen and unavoidable accident; but such rights shall only continue for a reasonable time, and until, with the exercise of proper diligence and care, such obstruction can be removed. But these provisions shall not in any degree relieve the company from the above provisions in regard to diligence, but shall not be held to require of said party of the second part that it shall take or mine any given quantity of coal from said land.

"When this lease shall have been performed by said party of the second part, and upon condition that it shall have taken out all the available coal from said lands as contemplated, then the expiration of the term shall not deprive said party of the second part of the right to the right of way, side tracks, shafts, and four

(4) acres around each shaft, if it is desired to continue them in use in connection with the mines on other lands; and such right thereto shall continue free so long as they can be used by said party of the second part in connection with their general mining operations.

"At the expiration of the term of this lease, or sooner, if the same shall be sooner terminated, the said party of the second part shall have the right to remove all machinery, trade fixtures, and improvements pertaining exclusively to the land for agricultural purposes, and said right of removal shall continue for a period of thirty days after such termination or expiration of this lease; but in exercising the right of removal of improvements, tracks, etc., it shall be done carefully and prudently, so as not unnecessarily to injure or impair the shaft, or other parts of said mine. The party of the second part hereby agrees to pay all taxes levied upon so much of said lands as to which said party of the second part has control and possession of the surface.

"It is further agreed that if at any time the said party of the second part shall abandon, or willfully omit to carry on in good faith, the mining business and mining coal from said lands herein described, as provided in this lease, or if said party shall fail or neglect to pay the royalty, according to quarterly settlements, for any two (2) consecutive quarters, for a period of fifteen (15) days after the maturity of the last or second of such quarterly installments, then, in either of said contingencies, said party of the first part shall have the right, absolutely, to determine this lease by giving a written notice of his election so to terminate it. Such notice shall be given to the party of the second part at its office in the city of Burlington, and if, upon such notice, the payment, principal and interest, is not made within ten (10) days thereafter,

said lease shall absolutely terminate; but no right so to surrender or abandon said lease is hereby given to the party of the second part. But temporary stoppage of mining, in consequence of strikes or accidents, or from other causes beyond the control of said party of the second part, or for other causes such as may occur in the legitimate business and good faith on the part of said party of the second part, without their intentional fault, shall not be deemed an abandonment or willful omission, within the meaning of this clause.

"Any installment of royalty remaining unpaid for a longer period than fifteen (15) days shall draw interest at the rate of ten (10) per cent. per annum after its maturity until paid. Said party of the second part is hereby required, within a reasonable time after each quarter, to furnish to said party of the first part, by mailing to his last known address, a correct statement of the amount of coal taken from said land during said preceding quarter. And said party of the first part shall have access at all reasonable times, and the right to inspect all books and papers pertaining to the quantity of coal mined during said quarter, and to examine said mines by himself or agent.

"The said party of the second part, so long as it is in possession of said land, and not in arrears more than two (2) quarters, shall have, and is hereby invested with, the right and option of purchasing said lands herein described at any time within the period of ten (10) years from January first (1st), 1880, at the agreed price of forty-five thousand dollars ($45,000), said right to be exercised by giving to the party of the first part, or to his heirs, a written notice of such election to purchase said lands; and in case the residence and address of said party of the first part, or his heirs, is not known to the party of the second part, then said notice of election to purchase may be made by publishing the same in some newspaper published at Burling-

ton, Iowa, for a period of ten (10) days, and upon making said election it shall be, and it is hereby made, the duty of the party of the first part to make, execute, and deliver, without delay, to said party of the second part, a good and sufficient warranty deed in which his or their wives shall join, conveying said real estate to said party of the second part, its successors or assigns, in fee simple, upon the receipt of the purchase money, but the exercise of this election shall not release said party of the second part from payment of any royalty in arrears.

"In witness whereof, we, the parties hereto, have hereunto set our hands this seventeenth (17th) day of February, 1880.    This contract executed in duplicate.

"[SEAL]    BYRON O. CARR.

"WHITEBREAST COAL & MINING CO.

"By J. C. OSGOOD, President.

"C. M. SCHENCK, Secretary."

In May, 1886, the lessee assigned its interest in the lease to the Whitebreast Coal Company, and in June, 1887, that company assigned the interest thus acquired to the Whitebreast Fuel Company. The three companies named are made parties defendant, but it is agreed that, if the plaintiff is entitled to recover in this action against any of the companies, judgment for the entire amount found to be due shall be rendered against the Whitebreast Fuel Company. J. C. Osgood and C. M. Schenck were also made parties defendant, but subsequently the action as to them was dismissed.

Soon after the second lease was executed the lessee sunk a shaft known as "shaft number 2" in the Carr land, at the most available place from which to reach all that land as quickly as possible, and commenced running entries in various directions for the purpose of taking out coal. During the years 1880 and 1881 more than one-half the coal mined by the company in Lucas

county was taken from the Carr land, but after those years the amount taken from the land each year was less than the quantity so taken from other land in Lucas county. The amount taken from the Carr land did not equal one hundred and thirty thousand tons in any year. It was largest in the year 1885, and diminished rapidly from that time, until, during the seven months of 1889 preceding the commencement of this action the amount so taken was but eight hundred and seventy-five tons. A few hundred tons have been mined since that time.

When the second lease was made, the lessee was using at shaft number 1, for the purpose of separating lump coal from other grades, a screen of diamond-shaped bars, separated by spaces of one inch in width, known as a "diamond screen." In May, 1883, screens made of bars placed one and one-half inches apart were substituted for the screens first used. The plaintiff seeks to recover royalty for coal alleged to have been mined from his land, on account of which he has not been paid, for coal which was not mined, but which he claims was required by the lease to be mined, and for coal which he alleges passed through the screens adopted in 1883, which would have been left in the coal for which he was entitled to a royalty by the screens first used. The plaintiff has received, under the lease in suit, royalty to the amount of fifty-two thousand, five hundred and eighty-eight dollars and forty-seven cents. He claims, in addition, thirty-four thousand, six hundred and twenty-nine dollars and forty-six cents on account of coal not mined, and three thousand, five hundred and nine dollars and ninety-four cents on account of lump coal alleged to have passed through the enlarged screens, with interest on both sums. The defendants claim that they have mined all the coal which the lease required them to mine, for the reason that the supply of available coal

has been exhausted, and that they have fully paid all royalty due for coal actually taken out of plaintiff's land.

I. It is shown that the plaintiff has been fully paid for all coal mined in his land, which actually passed over the screens used by the defendants, and, as he does not seriously contend that the evidence justifies any other conclusion in regard to that branch of the case, it will not be further noticed.   The evidence also satisfies us that the available coal deposits in the plaintiff's land have been exhausted.   Soon after the new lease was made the lessee proceeded, with due diligence, to take out the coal which was available for mining.   In some portions of the leased premises, coal was found in a condition to mine, and was taken out; but other portions, comprising about one hundred and seventy acres, were found to contain no coal, or to contain only coal which was not available for mining, for want of a suitable roof, or because the vein was too thin, or because of other reasons which made the running of it impracticable.   In its fruitless search for coal the lessee run expensive entries, and sunk numerous test holes, on the plaintiff's land, and on other land in that immediate vicinity at an expense of from twenty thousand dollars to twenty-five thousand dollars.   One-half of that amount, at least, was spent in direct test of the Carr land.   While engaged in mining and testing for coal in that land the company employed as many men as it could use, both day and night, in prosecuting its work; and it can not be charged with any failure to use due diligence in finding and removing all the available coal which the land contained.   Therefore, we are required to determine whether the lease in suit made the lessee and its assigns liable for coal not mined, and which did not exist.   The appellant insists that it does, for the reason that the lease was an entirety; that it

1. LEASE of coal land: mutual mistake: construction.

was not merely a lease for coal, but for all minerals,. and for other purposes; that it gave to the lessee the actual use and occupancy of two hundred and fifty acres of the surface; that portions of it contained a good, workable vein of coal, and that the rent to be paid for the rights conferred by the lease was one-fourth of one cent. per bushel for all lump coal mined, which was to be more than one-half of all the coal mined by the company in Lucas county; that he has not been paid a royalty for a "majority," or more than one-half, of all the coal mined by the defendants in that. county during the term of the lease; therefore, that he is entitled to the difference between the amount of royalty at the rate specified on more than one-half of all the coal mined, and the amount of royalty actually received.

It is claimed by the defendants that the parties to the lease executed it under a mutual mistake of fact in regard to the amount of coal contained in the land, and that the defendants are not liable on account of coal erroneously believed by both parties to be available for mining when the lease was made. The plaintiff denies the alleged mistake. It is clear that the lessee believed, when it executed the lease, that the deposits of available coal in the Carr land were ample to enable it to fulfill all conditions required of it by the lease. It knew that there were some defects in the veins of coal in that locality, but such defects exist in most. beds of coal, and those known to the lessee were not sufficient to charge it with notice of the entire absence of available coal in a large portion of the land. It is true the lessee had been in possession of the land under the Haven lease, and that it might have made exhaustive tests to ascertain where available coal could be found before executing the second lease, but it was not negligent in not doing so. It had found an abundance of coal while operating under the first lease, and had no

reason to believe that available coal would be found in but little more than one-half of the land. It is true, the plaintiff had less actual knowledge of the land than that possessed by the lessee. He was a non-resident of the state, visited the land rarely, and derived his knowledge of it largely from the reports of his lessees. But it is clear that he shared in the belief of the lessee that there was an abundance of coal for the purposes of the lease. He was told by Haven and Osgood, or other experts, that in their opinion it would require thirty years to exhaust the available coal on the lands, and says, "My belief was that my entire tract was underlaid with coal." The source of the information on which his belief rested is immaterial. The lessee manifested its belief that available coal existed in all the land by locating shaft number 2 in the best place from which to reach all parts of it, and by driving expensive entries for that purpose. The lease itself contains evidence that it was based upon the assumption and belief that the land contained an abundance of coal. It provides for a royalty to be paid on coal to be "taken out" of the leased land. It recites as a part of its inducement, and essence, that the lessee will, during the entire term of the lease, "vigorously, diligently, and in good faith, without evasion, prosecute its mining and coal business in Lucas county so as to increase and promote that business so far as practicable; that it will faithfully, and without evasion, conduct the principal business of mining in said county of Lucas on and from the lands herein mentioned and described, and that the said party of the second part will take and mine from said land a majority, in bushels and weight, of all the coal that is by said party of the second part mined in said county of Lucas in each and every year; but, when the amount of coal taken from the lands herein described shall aggregate two hundred thousand tons per annum, then, and so long as such quantity, two

hundred thousand tons, shall be mined from said land annually, said party of the second part's right to mine from the other land shall be unlimited." The evident purpose of these provisions was to require the lessee so to conduct its business as to make the quantity of coal taken from the land of the plaintiff during the term of the lease as large, at least, as reasonable diligence would make it, not exceeding two hundred thousand tons annually, in order that the plaintiff should receive a large amount of royalty. He would not have been benefited in any other manner by the mining of his coal, for it was the intent that the royalty paid should be computed on coal in his land, and not on that in the land of another. The lease was to continue until the lessee, with the use of due diligence, should be able to mine and remove from the leased premises "all the available merchantable and salable coal to be found therein." The lease provided that when it "shall have been performed by said party of the second part, and upon condition that it shall have taken out all the available coal from said lands, as contemplated," the lessee should be entitled to certain rights in connection with its general mining operations.

It is clear that the chief purpose to be accomplished by the lease was the mining from the leased premises of all the available merchantable coal, and the payment to the plaintiff therefor of the royalty specified. As the supply of coal became less, fewer men could be employed in mining it, and as a consequence the quantity mined diminished from year to year after 1885. When that condition of affairs was reached, the only method of complying strictly with the terms of the lease, left to defendants, was to reduce their output from land not included in their Carr lease. An agreement which required such a course would have been of no benefit to the plaintiff, and therefore would have been unreasonable, and contrary to public policy.

*Arnot v. Pittston & Elmira Coal Co.*, 68 N. Y. 559; *Navigation Co. v. Winsor*, 20 Wall. 64; *Mandeville v. Harman*, 7 Atl. Rep. (N. J. Ch.) 37. It may be said that for all practical purposes it became impossible for the lessee to comply with the terms of the lease, in consequence of the exhaustion of the coal deposits. The inability of defendants to carry out their agreement was not due to any fault on their part, but to a mistake of fact, shared by plaintiff, in regard to the extent of the deposits. The equities in favor of plaintiff are not persuasive. He has been paid for all the available coal which his land contained, at the agreed price, and the lease contemplated nothing more. He seeks to take advantage of the fact that as his coal became exhausted the defendants did not reduce their mining operations elsewhere, although no possible benefit could have resulted to him, had they done so. He complained in the year 1884 that the amount of coal mined from his land by defendants was not as great as that they were mining from other lands in Lucas county. In consequence of his complaint a meeting was held in Burlington, in July of that year, which was attended by the plaintiff and his attorney, and by representatives of the lessee. It was then known that the supply of available coal was not so great as the parties believed it was, and the mining operations and prospects were fully discussed. Plaintiff then expressed the belief that the lessee was doing all that it could be asked to do to comply with the terms of the lease. He has received about eight thousand dollars, in royalties, in excess of the amount fixed in the lease, for which defendant could have purchased the land. In addition he has received two thousand dollars for an eighty acre tract of the land, sold to defendants in January, 1889.

The plaintiff insists that defendants should have surrendered the premises, in order to be exempt from

paying royalty on the larger part of the coal they mined each year in Lucas county. But they had no right to do so until the coal was exhausted. They made little or no use of the surface of the land, excepting to carry on their mining operations, and the value of such use for general purposes was not greater than the taxes they were required to pay. It is not claimed that defendants removed any mineral from the land, excepting coal.

We are of the opinion that the defendants are not liable for coal not contained in the leased premises. Our conclusion finds support in the following authorities: *Fritzler v. Robinson*, 70 Iowa, 500; *Gibben v. Atkinson*, 31 N. W. Rep. (Mich.) 570; *Dexter v. Norton*, 47 N. Y. 62; *Muhlenberg v. Henning*, 9 Atl. Rep. (Pa. Sup.) 144; *McCahan v. Wharton*, 15 Atl. Rep. (Pa. Sup.) 615; *Walker v. Tucker*, 70 Ill. 528; *Brick Co. v. Pond*, 38 Ohio St. 66; *Cook v. Andrews*, 36 Ohio St. 175; *Clifford v. Walls*, 18 Weekly Rep. 925; Bishop on Contracts, section 588.

It is said that the doctrine of the authorities cited is applicable to cases where no mineral exists in the leased premises when the lease is made, and not to cases like this, where mineral exists, but not in sufficient quantities to meet the requirements of the lease. We are of the opinion that the rule is applicable to both classes of cases. So far as a failure of consideration is involved, this case is governed by section 2114 of the Code, which provides that "the want or failure, in the whole or in part, of the consideration of a written contract, may be shown as a defense, total or partial, as the case may be. * * *"

It is claimed that what we have said is in conflict with the rule announced in *Flynn v. Mining Co.*, 72 Iowa, 742, where a lease similar in many respects to that involved in this case was construed. But in that

case no question based upon a failure of the coal deposits was determined.

II. The plaintiff claims that the terms "merchantable coal" and "salable coal," as used in the lease, were so used with reference to the screen

2. —: royalty: change of screens. used at the time the lease was made, and that it was understood and intended by the parties to the lease that all coal which would pass over such a screen should be regarded as coal upon which plaintiff should be entitled to a royalty. The facts appear to be that before the new screens were adopted the miners were required to clean the coal in the mines by using forks, rakes and riddles, and that it was intended that all coal which would pass through such implements should be left in the mine. But some of the miners performed that part of their work carelessly, and sent out quantities of slack, pea, and nut coal. In many cases the inferior coal sent out was so loaded in the mine cars that it was carried by the lump coal, in large quantities, over the screens, and into the railway cars which were designed for the merchantable or salable coal, commonly known as "lump coal." The coal taken out of the Carr land, and from other land in that vicinity, was easily reduced to the inferior grades by careless handling. As a result of the character of the coal, and the manner in which it was delivered in the railway cars, much complaint was made by the buyers of coal, and in order to obviate some of the difficulties specified, and to prevent the loss of its best customers, the lessee adopted its new screens. We think they were authorized to do so by the facts stated. It must be presumed that the merchantable and salable coal contemplated by the lease was to be of a quality to compete with the same grade placed upon the market from other mines. Moreover, the plaintiff has failed to show that he has not received royalty on as large a proportion of the coal mined since the new screens were

adopted as he did before. While lumps of coal of larger size will undoubtedly pass through the new screens than would have passed through the old ones, yet the evidence shows that under the old method of cleaning considerable quantities of coal were left in the mines which would not have passed through either screen, and that under the new method all coal is brought out, and thrown onto the screens. Several practical miners testify that as large a percentage of the coal mined passed over the new as over the old screens, and was classed as lump coal. If their testimony is reliable, and we can not say that it is not, the plaintiff was not affected injuriously by the change of screens, even if such change was unauthorized. The conclusions announced dispose of the controlling questions in the case.

The decree of the district court is AFFIRMED.