HENRY WILSON and EUGENE SHONTZ, Appellees, v. THE BIG
JOE BLOCK COAL COMPANY, Appellant.

**Evidence:** CONCLUSION OF WITNESS. A witness should not be per-. mitted to state his own opinion as to a material proposition of mixed law and fact, but should state the facts and leave the conclusion to be drawn therefrom to the court and jury.

**Mines and Mining:** LEASES: ROYALTY: EVIDENCE. Under a contract providing that the lessee of an undeveloped mine should mine not less than a stated quantity each year, and in any event to pay a minimum royalty unless unavoidably prevented from taking out coal, he should have been permitted to show in defense to an action for the royalty that the mine could not be worked at a profit owing to the peculiar formation of the coal deposit.

**Same.** A lease obligating the lessee to mine all coal underlying the leased premises is satisfied by a removal of such as can be reached by the reasonable expenditure of money and labor according to approved methods among practical miners in that territory.

*Appeal from Appanoose District Court.*— HON. C. W. VER-
MILLION, Judge.

TUESDAY, JUNE 4, 1907.

ACTION at law to recover rents or royalties upon a mining lease. Verdict and judgment for plaintiffs for $1,000 and the defendant appeals.— *Reversed.*

*J. M. Wilson,* for appellant.

*Howell & Elgin,* for appellees.

WEAVER, C. J.— On January 20, 1893, the plaintiffs let to the Gladstone Coal Company the right to mine coal under a tract of land in Appanoose county, together with other privileges, which we need not stop to enumerate. By

the terms of the lease the lessees undertook to sink shafts to the underlying coal and to commence the work within six months and to complete the same as soon as it could be conveniently accomplished. In consideration of such lease the lessee undertook to pay the plaintiffs a royalty of five cents per ton, settlements to be made monthly. The lessees further stipulated as follows: "The parties of the second part agree that after one year from the time they commence shipping coal from said mine that they will mine and take out not less than 8,000 tons of coal each and every year thereafter, and, if they so fail to take out said amount, they agree to pay for the same at the rate of 5 cents per ton, but, if second parties are prevented from taking out said coal on account of any matters that they cannot avoid, then they shall not be required to take out any certain amount of coal or to pay for any amount not taken out." On October 28, 1896, the defendant herein purchased said lease from the Gladstone Coal Company and undertook the work of developing and operating the mine. Plaintiffs charge in their petition that the defendant has failed to observe the terms of the lease, in that it has failed to produce or to pay royalty upon the minimum quantity of coal provided for by the agreement, and allege that during the years 1896, 1897, and 1898 it produced only about 6,000 tons per year, and since the latter date has produced none at all. Based upon these allegations damages in the sum of $2,900. are claimed. The defendant answers in denial, and alleges that the failure to produce coal was owing to no neglect or want of due effort on its part but that in opening the mine the coal deposit was found to be in such a defective condition and the natural difficulties to be overcome were so great as to render the operation of the mine impracticable, for which reason after due effort to operate the same it wholly and permanently abandoned the lease on or about August 13, 1898. It further alleges that this abandonment was made with the full knowledge of the plaintiffs, who made no objections thereto,

and gave defendant reason to believe that they acquiesced therein. The appellant does not question the sufficiency of the evidence to sustain the verdict, but rests its right to a reversal upon alleged errors occurring upon the trial.

I. As will be noted from the foregoing statement, one material issue presented by the proceedings was the alleged abandonment of the mine by the defendant with the acquiescence of the plaintiffs. As bearing upon this question the plaintiff Shontz, being examined as a witness in his own behalf, was asked by his counsel: " Now, while it is a fact that they did not operate the mine or try to, yet have they done anything in the way of surrendering over any of the things that they took or had while they were operating the mine ? " To this inquiry the witness was allowed, over the defendant's objection, to answer, " No." The objection should have been sustained. The inquiry did not direct the attention of the witness to or .call for a single specific word, act, or omission on part of the defendant; but called for the witness' conclusion or opinion upon a material proposition of mixed law and fact. Whether the defendant had " done anything in the way of surrendering " the mine or the property connected therewith depends entirely upon the things which it had done or omitted to do. The witness should have answered as to these facts, and left the conclusion to be drawn therefrom to the court and jury. This proposition rests upon principles which are elementary in the law of evidence.

1. EVIDENCE: conclusion of witness.

II. The exceptions taken by appellant to several rulings of the trial court and to its instructions to the jury turn upon the question whether the defendant would be relieved from its obligation to pay a minimum royalty of $400. per year by the fact that the mine could not be profitably operated. By reference to the clause quoted from the lease, it will be seen that this minimum payment was not to be exacted if the

2. MINES AND MINING: leases: royalty: evidence.

lessee was "prevented from taking out coal on account of any matters that it could not avoid." The testimony on part of the defendant tended strongly to show that after sinking a shaft to the coal and driving entries therefrom through the deposit numerous "faults" were found. As we understand it, a "fault," as the word is here used, refers to interruptions in the continuity of the coal deposit caused by displacements in the formation, or by a pinching together of the overlying and underlying rock strata. When a fault is encountered, the practicability, if not the possibility, of further mining in that direction, depends largely upon the ability of the miner to drive his entry through the intervening rock until the coal formation or deposit is again found. If the distance is not too great and the intervening rock is of a character to be penetrated, mining may be resumed with practical success; but, if the faults are too frequent and the distance and difficulty of driving the entries are too great, the mine is incapable of practical or successful operation.

There was evidence that the coal under plaintiff's land was found to be broken by numerous faults, varying from four to seventy-five feet in extent, thus materially interfering with operation of the mine. Referring to this condition, the plaintiff sought to show by expert operators that such a mine could not be worked with success or profit. This evidence was ruled out by the court with the remark: "I will allow you to show that it would be impracticable or impossible to carry on the work, but I don't think the question of profit is a proper element of it." Several witnesses were permitted to testify as to the practicability of working such a mine; but all testimony as to whether it could be worked at a profit or in competition with other mines in that vicinity was excluded.

After much consideration we reach the conclusion that in ruling out the evidence upon the proposition whether it was practicable to work the mine with profit the trial court was in error. The saving clause of the lease, by which the

lessee was to be relieved from the payment of royalty if prevented from taking out coal on account of matters which it could not avoid, must be given a reasonable construction. To say that it was intended to bind the lessee to continue paying the minimum royalty of $400 so long as there was any possibility of producing 8,000 tons of coal per year, regardless of the expense required for such production and regardless of profit to the lessee, would certainly be unreasonable. This is not to say that the mere question of profit and loss which might arise by fluctuations in the coal market would affect the rights of the parties, for as to such hazards the lessee took his chances, but the language of the lease indicates that the parties had in mind the possibility of unforeseen natural difficulties in the operation of the mine, which was not yet opened and the practicability of working which had not yet been demonstrated. The venture at the date of the lease was still an untried experiment, and it is evident that the lessee did not desire to take upon itself the burden of paying royalty if upon opening the mine or at any stage in its operation it developed defects which rendered the production of coal either impossible or financially impracticable. We cannot presume that the plaintiffs intended to impose, or that the lessee intended to assume, any obligation to continue indefinitely to carry on the operation of a mine which by reason of " faults " or other natural defects could only be operated at a loss.

It is to be observed, also, that the lease in question is not for any definite term of years, but provides for its continuance until the parties of the second part shall take out and remove all of the coal underlying the 3. SAME. leased premises. This cannot be construed as meaning the literal removal of all of the coal under the land, but rather the removal of all the coal which is capable of being mined by the exercise of reasonable skill and effort. Whenever that limit was reached, and further mining on the premises could not be

carried on with reasonable expenditure of money and labor in accordance with the methods approved among practical miners in that territory, we think the obligation to continue the effort would be fulfilled and the duty to continue the payment of royalties would cease. We do not undertake to say that this point had in fact been reached by the defendant when it ceased to operate the mine, but the defendant was entitled to present its evidence in support of that theory and to have the question submitted to the jury. This conclusion is decisive of most of the material questions urged upon our attention in the arguments of counsel. Other exceptions to the rulings of the trial court do not appear to be well made, and we shall take no time for their discussion.

For the errors pointed out a new trial must be had, and for that purpose the judgment of the district court is *reversed*.