ARTHUR H. LIBBY et al., Appellants, v. NATIONAL SEWER PIPE COMPANY, Appellee.

**MINES AND MINERALS:** Leases—Termination.  A lease of mineral lands may not be terminated by the lessee on the ground that the quality of the minerals proves to be *unsatisfactory* and the removal of the minerals entails an *unexpected expense,* the lease being silent as to said matters.

*Appeal from Hamilton District Court.*—R. M. WRIGHT, Judge.

NOVEMBER 20, 1923.

ACTION in equity, for an accounting and to recover a sum alleged to be due as royalties under a lease for the removal of clay from the leased premises, to be used in the manufacture of clay products.   Plaintiffs' petition was dismissed, and judgment entered against them for costs.   Plaintiffs appeal.—*Reversed and remanded.*

*Martin & Alexander, William B. Moak,* and *Thomas J. Graydon,* for appellants.

*O. J. Henderson* and *D. C. Chase,* for appellee.

STEVENS, J.—This is an action in equity, for an accounting and to recover the minimum of royalties or rentals alleged to be due appellants from appellee, a corporation organized and doing business at Webster City, Iowa, for the manufacture of sewer and drain tile, upon a written lease executed July 1, 1912. The execution of the lease and the removal of large quantities of clay from the demised premises, a 40-acre tract in Hamilton County, are admitted by appellee. The lease, which is for 99 years, with a provision for its termination by notice at the expiration of 10 years, granted to appellee "the coal, clay and minerals, together with the right to excavate, uncover, mine and remove the same from the several parcels and tracts of land hereinafter described, which coal, clay and minerals the said lessee may remove by stripping, mining or any other method of excavating the same." It also provided for the payment of royalties as follows:

"Fifteen (15) cents per ton for each ton of clay or other mineral mined, excavated and removed from the premises, providing the aggregate tonnage removed shall not exceed forty thousand tons during the calendar year. And ten (10) cents per ton for each ton of clay mined, excavated and removed, providing the aggregate tonnage removed shall equal or exceed forty thousand tons in such calendar year. And twenty (20) cents per ton for each ton of coal mined and removed from the said premises. The amount of the rental and royalties herein stipulated for shall in no event be less than three thousand dollars ($3,000) per year."

The defenses set up by appellee to appellants' cause of action are, in substance, that its officers were induced to enter into the written lease by the representations of appellants and their agents that the surface of the leased premises was underlaid with an inexhaustible quantity of red clay and other clay suitable for the manufacture of first-class sewer and drain pipe or tile, which representations were false and untrue; that the lease was entered into under a mutual mistake by the parties as to the quantity and quality of the clay on the premises; that it was terminated in 1920 by the exhaustion of all of the clay fit or suitable for the manufacture of a merchantable quality of

sewer and drain tile; and that there was a failure of consideration for the contract.

As the record is somewhat voluminous, and as the issues cannot be very well disposed of without a detailed recital and discussion of the facts, we will precede such recital and discussion with a brief statement of the law which seems to us decisive· of the vital question presented for review.

The present lease contains no clause or provision descriptive of the quality or quantity of clay suitable for the manufacture of sewer and drain tile, nor for the termination of the lease in case of the supply's becoming exhausted, or of the intervention of circumstances making the expense of removal prohibitive, or so great as to preclude the possibility of profit. In this respect, the case differs from some of the cases hereafter referred to. The consideration for a mining lease is necessarily somewhat different from the lease of a building or premises to be used for pasture, or for agricultural or other kindred purposes. The tract in question is rough, and the clay had to be removed from a depth considerably below the surface. Neither party knew, at the time of the execution of the lease, the extent or quality of the clay, except as it was shown by a small quantity which was cropping out of the surface. All of the parties to this controversy contend for themselves that they acted in perfect good faith in entering into the lease. We are inclined to accept this interpretation of their purposes, and to assume that the belief that there existed a large or inexhaustible quantity of clay underneath the surface was shared equally by the respective parties to the contract. It has been held that a contract entered. into under such circumstances terminates when it develops that the parties were mistaken as to the subject-matter óf the contract. *Fritzler v. Robinson,* 70 Iowa 500; *Muhlenberg v. Henning,* 116 Pa. 138 (9 Atl. 144) ; *Brooks v. Cook,* 135 Ala. 219 (34 So. 960) ; *Diamond Iron Min. Co. v. Buckeye Iron Min. Co.,* 70 Minn. 500 (73 N. W. 507) ; *Adams v. Washington B. L. & Mfg. Co.,* 38 Wash. 243 (80 Pac. 446). We said, in *Fritzler v. Robinson,* supra :

"It appears very clear, however, from the evidence, that the lease or conveyance was executed, delivered, and received

under the belief that there was coal underlying the premises, and that the same could be mined. It is equally clear from the testimony that there is no coal there. The lease was, therefore, entered into by the parties through a material, honest mistake of fact, of vital importance to the validity of the contract. Both parties were dealing in regard to something they supposed to be in existence, so far as either had any knowledge. Against such a mistake equity will grant relief.''

The law also appears to be fairly well settled that, if the mineral becomes completely exhausted, the contract is terminated, and the lessee relieved from the duty of paying further royalty. *Fritzler v. Robinson,* supra; *Carr v. Whitebreast Fuel Co.,* 88 Iowa 136; *Ellis v. Cricket Coal Co.,* 166 Iowa 656; *Blake v. Lobb's Estate,* 110 Mich. 608 (68 N. W. 427); *Gaines v. Virginia & Ala. Coal Co.,* 124 Ala. 394 (27 So. 477); *Boyer v. Fulmer,* 176 Pa. 282 (35 Atl. 235); *Adams v. Washington B. L. & Mfg. Co.,* supra; *Muhlenberg v. Henning,* supra; *Walker v. Tucker,* 70 Ill. 527; *Bluestone Coal Co. v. Bell,* 38 W. Va. 297 (18 S. E. 493). This would also constitute a failure of consideration. *Carr v. Whitebreast Fuel Co.,* supra.

If the evidence shows that the clay was exhausted at the time of the abandonment of the premises, which occurred about April 1, 1920, then our conclusion is forecast by what we have already said. Upon this point, there is considerable conflict in the testimony of the numerous witnesses examined. The evidence offered on behalf of appellee to prove fraud in the inception of the contract is not very persuasive. On the contrary, we are convinced that all of the parties concerned in the negotiations for the lease believed that the premises, which are located in a community in which clay products are extensively manufactured, contained an abundance of suitable material for the manufacture of clay products. Appellee first secured an option for a lease, under which it removed a quantity of red clay and sent it to Bucyrus, Ohio, St. Louis, Missouri, and Ames, Iowa, for examination. The quantity sent to Bucyrus and St. Louis was manufactured into sewer pipe. The report from the clay sent to St. Louis, and also to Bucyrus, was extremely favorable: the experiment demonstrated that it was suitable for use in

manufacturing a merchantable quality of sewer and drain tile, of either large or small capacity. Appellee is incorporated under the laws of Maine, the stock being owned largely by farmers and business men residing in Webster City and vicinity. The plant is a large one, and its products are manufactured and sold upon a large scale. The testimony on behalf of appellee tends to show that the quantity of red or buff clay which was that desired for manufacturing purposes,—not, however, on account of its color, but on account of its quality,—is not inexhaustible, but exists in a stratum or vein about five or six feet in depth; that it is overlaid with a stratum of rock, and, above the rock, earth, the latter increasing in depth as the face is carried into the hill; that underneath the clay are substances not only unsuitable for use in manufacturing tile, but injurious thereto, and constituting a serious handicap to the removal of the clay without its becoming more or less mixed therewith; that the quality of the clay is not adapted to the manufacture of sewer tile, either alone or when mixed with other clay suitable for that purpose. Much of the clay used by appellee for several years was secured and shipped from a pit leased by it near Nevada, Iowa, or from other pits in the vicinity of Lehigh, where the premises in question are located.

It is claimed by appellee that the clay from which the samples sent to Bucyrus, St. Louis, and Ames were taken was in a pocket, and soon became exhausted. The evidence on behalf of appellant tends to show a stratum of red and buff clay of suitable quality from 10 to 12 feet in depth, and so located that it can profitably be removed by appellee. Appellants also contend that the lease was abandoned because of labor troubles, and because clay could be obtained cheaper at Nevada, and not on account of the exhaustion or inferior quality of the clay. Considerable quantities of sewer tile were manufactured and sold, but some of it proved unsatisfactory, was condemned, and a better quality was purchased by appellee and supplied to take its place. $40,000 or $50,000 worth of tile on hand was charged off by the company as practically worthless. Large quantities of drain tile have been annually manufactured and sold by

appellee.   Most of it was manufactured from other clay, or from clay mixed with that taken from the demised premises.

The evidence does not bear out appellee's contention that the clay is exhausted.   It does show that it is not well adapted to the manufacture of a merchantable quality of sewer pipe, and that considerable difficulty and expense are necessarily involved in taking it out of the hill.   This difficulty and expense would increase as the work progressed.   If the vein remained at the same level, à point would ultimately have been reached where the clay would be covered with earth and rock for a depth of more than 100 feet.   This would have made it necessary to remove the clay by a process of mining.   The evidence shows that mining is possible, but that the expense of removing the earth and rock above the clay would have been prohibitive.   If the appellee was relieved of further performance and liability under the terms of the lease at the time it abandoned the premises, it must be upon the theory that the clay so declined in quality that, as appellee got farther into the hill, it became unfit for use in the manufacture of appellee's products, or that the expense of obtaining it was prohibitive, or that its location was such as to render its removal impossible.   The lease contains no specific covenant as to quantity or quality of clay, nor any provision releasing appellee from the contract in case the quality is not adapted to the manufacture of sewer and drain tile, or in case the expense of removing it, on account of its location, becomes so great that it could not be used at a profit. Appellee has not argued the case upon the theory of implied covenants.   Many of the cases already referred to involved leases or contracts containing precautionary provisions, in effect sufficient to relieve the lessee, if the mineral or other substance constituting the subject of the contract became exhausted, or so depreciated in quality as not to be adapted to the purpose intended, or the expense became prohibitive.   No case has come under our observation in which the lessee, without any provision therein to that effect, has been held to be released from further performance or liability under a mining lease where the contract was silent as to these matters.

The case nearest in point in this state is *Wilson v. Big Joe Blk. Coal Co.,* 134 Iowa 594.   In that case, the obligation of

the lessee was held to be satisfied by the removal of so much
of the coal as could be reached by the reasonable expenditure
of money and labor, according to the approved, practical meth-
ods of mining coal. The decision of the court in that case, which
was reversed upon a ruling as to the admissibility of evidence
offered to show the impracticability of further mining the coal,
was based upon the following provision of the contract: ''If
prevented from taking out said coal on account of any matters
that it cannot avoid.'' The court said:

''After much consideration, we reach the conclusion that,
in ruling out the evidence upon the proposition whether it was
practicable to work the mine with profit, the trial court was in
error. The saving clause of the lease, by which the lessee was to
be relieved from the payment of royalty if prevented from tak-
ing out coal on account of matters which it could not avoid,
must be given a reasonable construction.''

Evidently, the difficulty encountered by the court in the
above case was as to whether the saving clause could be so
stretched as to release the lessee.

The provision in the lease considered in *Van Liew v. Nor-
wood-White Coal Co.*, 190 Iowa 79, contained the following pro-
vision: ''Or until such time prior thereto as the *minable* coal
under said premises shall have become exhausted.'' We said,
in interpreting this language of the contract, that:

''It is not necessary that the lessee should remove *all* the
merchantable coal. It is sufficient that the supply of coal shall
have been exhausted to such a degree that it is no longer profit-
able to mine the same.''

*Diamond Iron Min. Co. v. Buckeye Iron Min. Co.*, 70 Minn.
500 (73 N. W. 507), is a very strong and well reasoned case.
The court in that case adhered to the rule that exhaustion of
the mineral relieved the lessee from his obligations under the
lease, but said:

''Of course, we understand that the mere fact that leased
premises prove to be of less value than was supposed is no de-
fense to an action for rent.''

Most of the leases involved in the cases cited supra con-
tained a saving clause more or less specific. In fact, this was

true except in all cases where the mineral was shown to have become exhausted.

The clay left on the premises in question is not of a satisfactory quality for the manufacture of sewer pipe, and is inferior to that which was sent to Bucyrus and St. Louis to be tested. The business of appellee includes, however, the manufacture and sale of drain tile. There is, therefore, at best only a partial failure of consideration. No evidence was offered upon the theory of a partial failure of consideration. We are not, however, to be understood as holding upon this point that a plea of partial failure of consideration would be available to appellee, under the terms of the lease in this case. The failure of consideration, so far as it is shown, is not because of the exhaustion of the subject-matter of the contract, but because of the inferiority of its quality. The contract, as we understand counsel in oral argument, has been terminated by notice, in accordance with its terms. A good-faith effort appears to have been made by the officers of appellee, shortly before April 1, 1920, to terminate the contract, upon the ground that the clay was unsuitable for the manufacture of sewer tile, and that such as existed on the premises could not be used therefor at a profit. A committee was sent to Chicago to visit appellants, who were notified of the condition, and an effort made to compromise and adjust the matter so as to terminate the lease at once. These efforts resulted in failure.

We are convinced that the lease has proved an unprofitable one to appellee, but this court is powerless to relieve it upon this ground alone. We therefore, with some reluctance, reach the conclusion that the court below erroneously dismissed plaintiffs' petition. Its judgment is, accordingly, reversed, and the cause remanded for judgment and decree for plaintiffs for the amount due.—*Reversed and remanded.*

PRESTON, C. J., EVANS and DE GRAFF, JJ., concur.