MARY L. SCOVEL, Appellant, v. NORWOOD-WHITE COAL COMPANY, Appellee.

No. 43052.

SEPTEMBER 29, 1936.

Stipp, Perry, Bannister & Starzinger, for appellee.

Gillespie & Moody, for appellant.

DONEGAN, J.—On July 25, 1921, the plaintiff, Mary L. Scovel and her husband, J. B. Scovel, were the owners of a forty-acre tract of land located a short distance northwest of Des Moines, Iowa, and on that day they entered into a contract with the Norwood-White Coal Company, under the terms of which the coal company was to have the right to mine coal underneath the surface of said land. The contract provided that the coal company would test the land by drilling or otherwise for the purpose of trying to ascertain whether there was a minable vein or basin of coal underneath the said land; and in case it found a minable vein or basin of coal of sufficient quantity and quality to justify the opening and mining of said coal, in the opinion of said second party, the coal company agreed to mine out said coal with due diligence and to mine all minable coal underlying said land therein described. The contract also provided that the coal company should give the landowners a notice in writing of its determination to accept the lease on or prior to January 1, 1932. By agreement of the parties the time for completing tests and giving notice of acceptance was extended, and within such extended time the notice was given, and the lease went into effect on August 17, 1922.

The lease provided that the coal company might take the coal out of the land through shafts erected thereon, or that the coal might be taken out through shafts upon adjoining land. The coal company did not construct a shaft upon the land in question, but apparently decided to remove the coal under the Scovel land through passages extended from adjoining lands on which it had leases, and upon which its shaft had been constructed. The lease further provided for a royalty to be paid on coal removed from the land described in the lease, and that, beginning March 1, 1923, and until the coal company's entries reached the Scovel land, the coal company would pay as minimum royalties a surface rental of $3 per acre per year, in semi-annual payments on March 1 and September 1. By agreement

of the parties these dates were changed to May 1 and November 1. No coal was taken from the land included in the lease until some time in the summer or fall of 1930, and all royalties were paid as they became due. On November 1, 1930, the coal company sent Mrs. Scovel a check for $60 for the royalty due under the lease on that date and notified her that, because there was no further minable coal under her land, the company was electing to cancel and terminate the lease. Thereafter, no coal was taken from the leased land, no further payment of minimum royalties was made, and the coal company neither claimed nor exercised any further rights under the lease. On the 28th day of June, 1933, Mary L. Scovel, the plaintiff herein, filed her petition at law asking damages against the defendant coal company for the breach of the lease in the sum of $16,000. On the trial of the case this petition was amended, by striking the claim for $16,000 and by claiming the minimum royalties, as provided in the lease, for the six months periods ending on May 1 and November 1 in each year, from May 1, 1931, to November 1, 1934. The coal company answered, admitting the execution of the lease, the drilling tests, the extension of the time for testing and the notice accepting the lease, but alleged that the lease had been cancelled and surrendered by the defendant in accordance with its terms, that all payments due thereunder had been made to and including November 10, 1930, and that nothing was due the plaintiff thereunder since that date. The case was tried to a jury and, at the close of the plaintiff's evidence, the defendant made a motion for a directed verdict which was overruled. At the close of all the evidence the defendant renewed its motion for a directed verdict, with some additional grounds, and at that time this motion was sustained, and judgment was entered against the plaintiff for costs. From such ruling and judgment the plaintiff appeals.

I. Appellant contends that the case should be reversed, because of error which it is alleged the court committed in striking out the evidence of the plaintiff's witness, Mrs. Hoff, in regard to the defendant coal company having renewed a lease upon forty acres of land belonging to her, which adjoined the plaintiff's land on the west. On direct examination of this witness, she was interrogated in regard to her forty acres of land having been leased to the appellee within the last year or so. All of this evidence was objected to on the ground that it was im-

material and raised collateral issues, but these objections were overruled by the court. On cross-examination, in answer to questions asked by counsel for appellee, the witness stated that she had started suit against the appellee, and that the lease with the appellee was made as a part of a settlement under which she dismissed her suit. Motion was thereupon made by appellee's counsel to strike all the evidence in regard to the lease having been entered into between the witness and appellee; and was sustained by the court. Appellant argues that the taking of the lease on the Hoff forty acres was evidence showing that the appellee believed the Hoff land was underlaid with minable coal, and that, even if the lease was taken in settlement of a lawsuit, it would still be evidence that the defendant coal company would not have taken such a lease unless it thought minable coal existed under the land; and that this would be evidence tending to show that there was minable coal under the west part of the Scovel land, which adjoined the Hoff land. In our opinion, the evidence in regard to the lease taken by the appellee on the Hoff land raised collateral issues, and the evidence properly could have been rejected on the direct examination of the witness. This evidence as to the execution by defendant of a lease of the Hoff land being in the record, the defendant would have the right to meet it with evidence as to the terms of the lease and all of the attending facts and circumstances tending to show that the execution of that lease was in no way relevant or material to the issues in this case, and this would necessarily lead to collateral issues. The cross-examination merely elicited the fact that the Hoff lease was taken as part of a settlement of a lawsuit, and we think it was proper, when this fact appeared, to ask that all the evidence in regard to this lease be stricken, because it was a part of a settlement and was, therefore, incompetent.

II.   The really vital issue presented by the appeal is the error that appellant claims the court committed in holding that the evidence was not sufficient to carry the case to the jury on the question of the existence of minable coal on the leased land, and in sustaining defendant's motion for a directed verdict. Under the lease involved in this case, the defendant company was under no obligation to continue operations under the lease or to continue paying the minimum royalties unless there was minable coal under the land. The lease itself provided that, "Minable coal under this contract shall be construed to be such

coal as may be profitably won by the ordinary mining methods and systems in vogue in the mining district in which the above land is situated.''

In Carr v. Whitebreast Fuel Company et al., 88 Iowa 136, 153, 55 N. W. 205, 210, it is said:

''It must be presumed that the merchantable and salable coal contemplated by the lease was to be of a quality to compete with the same grade placed upon the market from other mines.''

Libby v. National Sewer Pipe Company, 196 Iowa 1320, 1323, 195 N. W. 749, 750, contains the statement:

''The law also appears to be fairly well settled that, if the mineral becomes completely exhausted, the contract is terminated, and the lessee relieved from the duty of paying further royalty.''

In Van Liew, Trustee, v. Norwood-White Coal Company, 190 Iowa 79, 81, 179 N. W. 960, 961, we used this language:

''The exhaustion of minable coal which justifies the termination of the lease is comparative, and not absolute. It is not necessary that the lessee should remove all the merchantable coal. It is sufficient that the supply of coal shall have been exhausted to such a degree that it is no longer profitable to mine the same.''

And in Ellis v. Cricket Coal Company, 166 Iowa 656, 661, 148 N. W. 887, 889, we said:

''Thus, as bearing on the minable character of coal, its accessibility, the condition of the earth over it, the interference by water, whether free from or mixed with other substances must be taken into account and where removal as an article of commerce is contemplated, the cost of mining and bringing the coal to the surface is a controlling consideration. The sole object of entering into this contract was to enable defendant to mine the coal in order to dispose of the same at a profit to the Chicago & Northwestern Railroad Company, and possibly others, and, in making use of the expression 'merchantable and minable,' the parties evidently intended that the coal to be paid for should be salable on the market, and that it be such as could be mined at a cost such as that defendant could put it on the market at some

profit to itself. Otherwise it was not minable, for a miner could not afford to mine it. A mine may not be minable because of the condition of the coal, its distance from transportation, the character of the mine, and other circumstances, but these facts are merely explanatory of the real reason (i. e., that the mining cannot be done at a profit), and, by the use of this expression, the parties surely intended that liability for minimum royalty should not attach, unless the coal was salable and could be mined at a reasonable profit.''

It is quite apparent, therefore, both from the definition of minable coal contained in the lease itself, and from the decisions of this court, that what will constitute minable coal involves much more than the mere presence of a vein of coal of a certain thickness.

This action was brought to recover the minimum royalties which it is claimed were due the plaintiff because of the provisions of the lease. The lease, however, provided that these royalties should be paid during the term of the lease, ''until all of the minable, workable or merchantable coal is mined out.'' It further provided that, ''when said minable, workable and merchantable coal is mined out, then and in that event this article shall be void.'' In order to recover the minimum royalties, the burden was on the plaintiff to show that there was still minable, workable or merchantable coal to be mined out. In her petition the plaintiff alleged that, for the six months periods ending on the dates May 1 and November 1 during the years 1931, 1932, 1933 and 1934, there remained and existed beneath the said land minable coal, and that the defendant made no payment of minimum royalties to cover these respective six months periods. By its answer the defendant admitted that minimum royalties, for the periods for which claimed by plaintiff, had not been paid, but denied that there was any minable, workable or merchantable coal beneath plaintiff's land. Under this status of the pleadings, it seems quite clear that the burden was on the plaintiff to prove that there was minable coal underlying the land covered by the lease, and such has been our decision in cases involving similar leases. Ellis v. Cricket Coal Company, 166 Iowa 656, 148 N. W. 887; Wilson, Admr. v. Big Joe Block Coal Company, 142 Iowa 521, 119 N. W. 604. In fact, we do not understand that the plaintiff denies that this burden rested upon

her. The position of the plaintiff, as shown by the alleged error which we are here considering, is that the court erred in holding that there was not sufficient evidence to carry the case to the jury, and in sustaining the defendant's motion for a directed verdict, "because there was evidence that coal three feet seven inches in thickness is ordinarily minable (Abst. p. 13, lines 1–3) ; the defendant stated in writing that it had found minable coal under the Scovel land, it accepted the lease (Abst. p. 49, line 27 et seq.) as provided in the lease (Abst. p. 49, lines 3–7) ; coal three feet seven inches in thickness was found on the Scovel land (Abst. p. 10, lines 22–26)." It becomes necessary, therefore, to examine the record and determine whether the evidence upon which the plaintiff relies was such as to make the question of the existence of minable coal upon the leased premises one for the jury.

Turning to the page and lines of the abstract set out by the plaintiff, we find that at the first place referred to the plaintiff's witness, Griffiths, testified that: "Under ordinary conditions coal measuring 3 feet, 7 inches in thickness is mineable. Coal of a greater thickness than 3 feet 8 inches is mineable." There is also evidence in the record that, in the south one-quarter of the plaintiff's forty-acre tract, about midway east and west, the drill hole showed coal 3 feet 7 inches in thickness, and near the northeast corner of this forty-acre tract the drill hole showed coal 3 feet 8 inches in thickness. The witness, Griffiths, although probably entitled to be considered an expert, does not show that he had any personal knowledge of the conditions surrounding the coal found in these two drill holes, and he was not answering as an expert to hypothetical questions in which these conditions were set out. There is nothing in this testimony nor, so far as we can recall, in any other part of the record, to show that the conditions surrounding the coal that was 3 feet 7 inches in thickness, or 3 feet 8 inches in thickness, were ordinary conditions. That coal 3 feet 7 inches or 3 feet 8 inches in thickness might not be minable is admitted by him in his further testimony: "I know there are quite a number of factors that go into the question as to whether or not a vein of coal is minable. The quality of the coal may have something to do with it. So may the roof conditions. Coal fields are sometimes rather spotted." We find nothing in the testimony of this witness that would

make the question of the minability of coal under the plaintiff's land one for the determination of a jury.

The plaintiff's next reference to the evidence which she claims made a case for a jury is found in the statement that, "the defendant stated in writing that it had found minable coal under the Scovel land, it accepted the lease (Abst. p. 49, line 27 et seq.) as provided in the lease (Abst. p. 49, lines 3–7)." The reference to the page and lines of the abstract shows that the plaintiff is here referring to the written notice of acceptance of the lease, and to a paragraph of the lease in which "Second party agrees not to record this lease unless minable coal is found beneath said land and this lease is duly accepted by notice in writing to first parties." Appellant contends that by accepting the lease and recording it the defendant admitted the existence of minable coal under the land. The provision of the lease was that the coal company would test said land by drilling or otherwise "to the extent necessary *in the judgment of the party of the second part* to ascertain whether there is a minable vein or basin of coal underneath the said land; and, in case there shall be discovered a minable vein or basin of coal of sufficient quantity and quality to justify the opening and mining of said coal *in the opinion of the said second party,* then it agrees to mine out said coal with due diligence and to mine all minable coal underlying said land herein described." (Italics are ours.) We think that a consideration of these provisions of the lease, in the light of surrounding facts and circumstances, makes it plain that the making of the tests and the acceptance and recording of the lease did not establish the existence of minable coal. The purpose of these provisions was to enable the coal company to make some investigation as to the existence of coal under the surface of the land so that it might determine whether there was a reasonable prospect that there was coal in such quantities as to justify the expenditure necessary in trying to remove it. The fact that the coal company, after making tests, believed that there was minable coal under the surface of the land did not change or obviate the provisions of the lease that the coal company agreed to prosecute its mining operations only "until all of the minable and merchantable coal is removed therefrom" (from the land), and that "when said minable, workable and merchantable coal is mined out, then and in that event, this article (in regard to paying minimum royalties) shall be void." There

is no evidence in the record that the making of the drill tests was sufficient to definitely determine that the coal was minable. In fact, the evidence of the plaintiff's witness, Griffiths, shows that conditions may be such that coal 3 feet 7 inches or 3 feet 8 inches in thickness, such as the drill tests showed upon this land, may not be minable. Whether it is minable or not depends upon facts which undoubtedly cannot be determined until the coal is actually reached in the regular course of mining operations.

The record shows that the coal here involved was located at a considerable depth from the surface. In fact, the log of one of the holes drilled shows that this hole reached a depth of 292 feet, and that the coal vein, which was 3 feet 7 inches in thickness, contained 11 inches of impure coal and was 288 feet 10 inches from the surface. Even to one without any knowledge of coal mining, it seems quite apparent that it would not be practicable for the coal company to sink a separate shaft where each deposit or pocket of coal was found, and that the practical way of mining such coal would be by extending underground passageways or entries to such coal from shafts and passageways already in operation. We find nothing in the provision of the lease in regard to drill tests, or in the fact that the lease was accepted and recorded, after tests had been made, that is sufficient to support the burden imposed upon the plaintiff of proving that minable coal still existed under the surface of the land, because of which the defendant was obliged to pay the minimum royalties.

Plaintiff argues that, because of a drill hole located near the northeast corner of the plaintiff's forty acres, a second drill hole toward the south of said tract and about midway east and west, and a third drill hole on the forty acres of Mrs. Hoff adjoining plaintiff's land on the west, all showed the existence of coal to a thickness of from 3 feet 7 inches to 4 feet 2 inches, this was sufficient evidence from which the jury might be allowed to find that these three drill holes marked the corners of a triangle inside of which there was minable coal underlying the land of the plaintiff. The evidence of all the witnesses, however, including the plaintiff's witness, Griffiths, quite conclusively establishes that the existence of coal at two or more places does not tend to prove that it exists at all intermediate points between these places. This witness said that, ''coal fields are sometimes rather spotted''; that

by spotted he meant "that there might be workable coal here and then you might hit something that changes the situation, and then you go on some distance and hit workable coal again. There may be a pocket here and a hole over there. Sometimes the coal cuts out entirely. Then you go on through until you hit coal again." Whether coal found under such conditions would be minable or not would undoubtedly depend upon the conditions existing in each particular case.

While not set out or argued under the statement of error which we are now considering, the appellant at other portions of her argument contends that, when she received her check for royalties in the spring of 1930, Mr. Wilson, the secretary and treasurer of the coal company, showed her a map and showed her how far they had to go before they reached her land, and told her that, when she came back again, she would get a big, fat check. She also testified that Mr. Wilson at that time told her that "he had got their coal all picked out" and that she was going to have bigger checks every time she came down. Mrs. Hoff, the owner of the land adjoining on the west, and a niece of Mrs. Scovel, also testified in regard to a conversation in which Mr. Wilson said that it would be very nice when Mrs. Scovel and Mrs. Hoff "would be able to get checks in every month from the coal that was being mined." It is quite probable that Mr. Wilson did tell these women that when the operations of the coal company reached their lands they would get larger checks, and it may be conceded that at that time Mr. Wilson expected that the operations of the company would continue into the land of Mrs. Scovel and Mrs. Hoff and that, instead of paying the minimum royalties, they would pay larger amounts of royalties on coal actually removed. There is nothing in this evidence, however, or in any of the evidence to which our attention has been called, which shows that Mr. Wilson, or any other officer of the company, had any more knowledge as to what the condition of the coal was that existed upon the Scovel land than was revealed by the drill tests; and, there is nothing in the evidence which indicates that a drill test can show any more than the condition existing at the point where the drill hole was made.

We find no evidence in the record, which, in our opinion, was sufficient to make the existence of minable coal under plaintiff's land a question for the jury, and we, therefore, find no

error on the part of the court in sustaining the defendant's motion for a directed verdict.

III. Other errors relied on by plaintiff for reversal go to the action of the court in admitting, over plaintiff's objections, evidence offered by two of defendant's witnesses. Inasmuch as the decision which we have reached is based upon the evidence presented by the plaintiff, and without in any way considering the evidence of these two witnesses, it becomes unnecessary to consider these allegations of error.

For the reasons given, the ruling and judgment of the district court must be, and are hereby, affirmed.—Affirmed.

PARSONS, C. J., and ALBERT, MITCHELL, KINTZINGER, RICH-ARDS, HAMILTON, and STIGER, JJ., concur.