## JOHN McCAHAN ET AL. v. H. S. WHARTON ET AL.

ERROR TO THE COURT OF COMMON PLEAS OF HUNTINGDON COUNTY.

Argued April 19, 1888—Decided October 1, 1888.

1. When the verdict in the court below was for the defendant, the Supreme Court will not reverse the judgment thereon and enter judgment for the plaintiff, especially when the pleadings, showing the issue on which the case was tried, are not furnished.

2. A judgment will not be reversed for a slight inaccuracy in a portion of the charge, when the case was otherwise fairly presented and the testimony adduced showed that the error was harmless.

3. A provision in an ore-lease that if the lessees did not quit possession and surrender the leasehold on or before July 1, 1884, "the very act of their refusing or neglecting to quit possession and surrender this lease is hereby agreed on their part that there is a sufficient quantity of ore on said property to pay the royalty of $1,200 on February 1, 1885," etc., is not to be held conclusive upon the lessees.

4. Such provision in the lease was to be construed as an admission which threw upon the lessees the burden of proving that there was not ore in paying quantities upon the leasehold, and if not there, the lessees were not liable for the stipulated minimum royalty : Muhlenberg v. Henning, 116 Pa. 138.

Before GORDON, C. J., PAXSON, STERRETT, GREEN, CLARK and WILLIAMS, JJ., TRUNKEY, J., absent.

No. 369 January Term 1888, Sup. Ct.; court below, No. 4 August Term 1885, C. P.

To the number and term in the court below, John McCahan and Thomas S. McCahan brought an action of covenant against Henry S. Wharton and F. H. Lane, for the recovery of the minimum royalty or rental payable under an ore lease. The narr was not printed in the paper books. The plea, as indicated, was "covenants performed," etc.

At the trial on December 23, 1887, the lease shown, dated February 1, 1884, of a tract of 440 acres of land near Birmingham Station, Blair county, gave from the plaintiffs, as lessors, to the defendants, as lessees, the exclusive right and privilege for ten years to prospect for, dig, mine and ship iron ore, on and from the said tract, for the term of ten years, under covenants, on the part of the lessees, to prosecute vigorously the work of digging and prospecting for ore, and, when ore was found in sufficient quantities to justify the shipping of the same, to work the said mines to their utmost capacity, and to pay 50 cents per ton for each ton shipped, the royalty in no event to be less than $1,200 for each and every year. It was also provided that, if the lessees did not quit possession and surrender the leased premises on or before July 1, 1884, the very act of their refusal or neglect so to surrender, was to be an agreement on their part that there was a sufficient quantity of ore on said property to pay the royalty of $1,200 on February 1, 1885. The provisions of the lease are fully set out in the charge of the court below.

Having put the lease in evidence, the plaintiffs followed by testimony that previous to the bringing of the suit the lessees had had nobody on the land to prospect for ore and had never taken out any ore.

On the part of the defendants, evidence was adduced to show, in substance, that in the spring of 1884 the lessees made several examinations of the leased lands and, finding indications of but little ore, concluded they were not justified in making further investigations, and that on June 13, 1884, a notice was mailed to the lessors that the lessees surrendered the lease. Called on cross-examination, the plaintiffs denied the receipt of the notice alleged to have been sent by mail,

Statement of Facts.

but one of them, Thomas McCahan, admitted, in reply to questions by the court, that Mr. Woods, of Woods & Taylor, attorneys and 'real estate agents, by whom the lease had been negotiated and prepared for execution, had told him that a notice had been served upon him (Mr. Woods) that the defendants had surrendered the lease.

The defendants called John Fulton, and proposed to prove by this witness and others who were familiar with the explorations for iron ore in that section of Pennsylvania, that they had been upon the lands embraced in the lease in evidence, had examined them with more or less thoroughness, and that, in their judgments, there was no ore upon the land which would justify mining or the expenditure of money in an effort to develop them. The offer was objected to, (1), because it was mere expert testimony, (2), because it was not proposed to show that after exploration, there was a failure to discover ore.

By the court: The witness may state what examinations he has made upon this land and what indications of the presence of ore he there found. As to the judgment of the witness, we will rule upon that question after we hear his testimony as to the knowledge and the extent of his investigations.[8]

The testimony of the witness supported the offer.

Samuel G. Isenberg, called by defendants :

Mr. Speer : I propose to show by the witness that he is acquainted with iron ore lands, and has been for many years prospecting for iron ore in this neighborhood and developing them, and that he was called upon to go upon the lands in suit for the purpose of examining and determining whether or not in his judgment there was any iron ore upon that land, and whether there was any iron ore there in such quantity and such condition that would justify its mining. That in response to this request he did go upon this land at different times and make examinations, and the result of such examinations is to satisfy him that ore is not upon the land in such quantities or in such quality as to justify its mining.

Mr. Petrikin : Plaintiffs' counsel object to the offer for the reason that in the articles of agreement is contained the following clause : [reciting portions of the section next to the last in the agreement copied into the charge of the court, post].

By the court : Taking that entire section in the agreement, which is partially incorporated in the objection, into consideration, its construction being for the court, we are of the opinion that this agreement casts the burden upon the defendants of showing the non-existence of iron ore upon the premises, and that the true construction of the agreement is in that respect, notwithstanding this clause in the agreement, not conclusive of the existence of the iron ore.   The expression occurs three times in this section; twice it is repeated as being an acknowledgment of the presence of iron ore in sufficient quantity, but that does not prevent the defendants from showing in the way of defence that iron ore does not exist in the premises ; therefore we admit the evidence and seal a bill for the plaintiffs.[9]

The testimony of this witness supported the offer.

The case being closed on the evidence, the court, FURST, P. J., charged the jury as follows :

This is an action of covenant brought by John McCahan and Thomas S. McCahan, plaintiffs, against H. S. Wharton and F. H. Lane, defendants, to recover damages for the failure to pay the royalty on 2500 tons of iron ore, which plaintiffs claim to be due on articles of agreement existing between them, on February 1, 1885, with interest on the same from the time it was due and payable.   There are other covenants in the agreement, but in this suit the claim is only for the first year's royalty of $1,200 on 2500 tons.   [In order that you may clearly understand the instructions of the court, we will call your attention to the important portions of this article of agreement; the entire agreement, however, is for you, and it will be carefully read and considered by you in the jury room] [1]

By the agreement offered in evidence, John McCahan and Thomas S. McCahan agreed as follows :

That the said John McCahan and Thomas S. McCahan for the consideration hereinafter mentioned, do lease and let unto the parties of the second part, Henry S. Wharton and F. H. Lane, the iron ore right, together with the exclusive right and privilege to prospect for, dig, mine and ship, on and from all that certain tract of land, situate on the line of the Penn. Railroad, near Birmingham Station, Blair county, Pa., containing 440 acres more or less.   It is further agreed that this lease is to be for the term of ten years from the 1st of February, 1884, and for such longer time, after the expiration of the said ten years, as both the said parties or their heirs, executors, administrators or assigns may agree, and at royalties not to exceed the royalty herein stated.

Charge of Court below.

In consideration whereof, the said parties of the second part, agree to push on and prosecute vigorously the work of digging and prospecting for iron ore, on the above mentioned premises, and just as soon as iron ore is found in sufficient quantities to justify the shipping of the same, then the parties of the second part agree to work the said mines to their utmost capacity, and they agree to bind themselves, their heirs, executors, administrators and assigns, and each of them, to pay to the said John Mc-Cahan and Thomas S. McCahan, their and each of their heirs, executors, administrators and assigns, the sum of 50 cents per ton, for each and every ton of iron ore mined and shipped from the above mentioned prem-'ises, said royalty of 50 cents per ton to be paid in monthly installments and in the following manner, viz.: one half to John McCahan, his heirs or assigns, and the remaining one half to Thomas S. McCahan, his heirs or assigns; and the said parties of the second part further agree and bind themselves, their heirs, executors, administrators or assigns, to thoroughly develop the iron ore deposits on the above described premises, and in case sufficient iron ore be found, that then the mining and shipments of iron ore shall not be less than 2500 tons per year; and that the royalty, if sufficient iron ore be found, shall in no event be less than $1,200 for each and every year during the continuance of this agreement.

And it is further agreed that, on the 1st day of February of each and every year during the continuance of this lease, there shall be an annual settlement between the parties of the first part and the parties of the second part of this agreement, and if the royalties paid during the year shall not amount to the sum of $1,200, then the difference between the sum of $1,200 and the monthly installments of royalties paid during the year, shall immediately become due and payable; one half of which shall be paid to John McCahan, and the other half to his brother Thomas. It is further understood and agreed, that if the parties of the second part, their heirs or assigns, do mine and ship from the premises aforesaid any quantity of iron ore in excess of 2500 tons of iron ore per annum, in that event the royalty to be paid on all iron ore in excess of 2500 tons, not exceeding 5000 tons per annum, shall be 40 cents per ton; and on all iron ore mined and shipped from the said premises, in excess of 5000 tons per annum, the royalty shall be 30 cents per ton; said royalties to be paid to the parties of the first part in monthly installments and in the manner above set forth.

And it is further understood and agreed, that if the parties of the second part do not quit possession of said premises, and surrender and give up all interest they may have in this lease, on or before the 1st day of July, 1884, the very act of their refusing or neglecting to quit possession and surrender this lease is hereby agreed on their part, that there is a sufficient quantity of iron ore on said property, to pay the royalty of $1,200 on the 1st day of February, 1885; and if the said parties of the second part continue to operate said lease for three months after the 1st day of February, 1885, it is an acknowledgment that there is sufficient iron ore to pay the royalty of $1,200 on the 1st day of February, 1886; and in each and every year during the continuance of this lease, if the said parties of the second

Charge of Court below.

part, shall continue to operate this lease, and hold and occupy the above described leased premises for three months after the 1st day of February in each and every year as aforesaid, it shall be an acknowledgment on their part that there is sufficient iron ore on said premises to pay the royalty of $1,200 per annum as above set forth.

And the parties of the second part agree, that if the royalty is not paid within 10 days after the same becomes due and payable, and written notice has been served on them to pay the same within 10 days, then the parties of the first part have the right to bring suit for the royalty due and unpaid.

These are the principal covenants in this agreement which are involved in the present issue. We have already said, that this action is brought to recover damages for the non-payment of $1,200 royalty stipulated to be paid, according to the tenor of this agreement, on February 1, 1885. It is only one instalment that is claimed in this action. This agreement being in writing, it is for the court to construe it, and it is the duty of the jury to take the construction put upon it by the court. [I will again call your attention to the important covenant in the agreement, so that you may properly understand the question of fact that is involved in this case. "It is further understood and agreed that if the parties of the second part do not quit possession of the said premises and surrender and give up all interest they may have in this lease, on or before the 1st day of July, 1884, the very act of their refusing or neglecting to quit possession and surrender this lease is hereby agreed on their part, that there is a sufficient quantity of iron ore on said property to pay the royalty of $1,200 on the 1st day of February, 1885." Under that clause of the agreement, these defendants had the right to go upon this property and dig for and develop the iron ore deposited in the land. No other covenant preceding this one required them to develop the iron ore, but to dig for and prospect, in order to determine the existence and extent of the ore in the premises. This clause provides, that if on or before July 1, 1884, they fail to quit possession and surrender all their rights under the agreement, it shall be construed to be an acknowledgment on their part that there was sufficient iron ore on the premises to pay this first year's royalty of $1,200. This occurs three times in this paragraph; the language where it first occurs is, "that it is agreed on their part," that is, on the part of the parties of

the second part, that there is sufficient quantity of iron ore on said property.   Where it occurs afterwards in the same paragraph, and in the same connection with the succeeding years, it is termed an "acknowledgment" on their part, that there is a sufficient quantity of iron ore on the premises.   Therefore, taking the entire section together, we say to you, that this clause in the agreement means that if the party of the second part fail to quit possession of the premises, and surrender to the parties of the first part all their rights under this agreement, on or before July 1, 1884, it is to be treated as an acknowledgment or an admission on their part, that there is a sufficient quantity of iron ore to pay the first year's royalty. But it is simply an acknowledgment; it is not absolute or conclusive; it casts the burden, however, upon the defendants to show the non-existence of iron ore.] [2]   The plaintiffs having shown the articles of agreement in evidence, containing this clause, this casts the burden on the defendants, to show the non-existence of iron ore: in other words it casts the burden on them to prove what is termed in law a negative, that is, that there was not sufficient iron ore in the premises to justify the mining and shipping of that quantity annually.

The language in relation to the quantity is also embraced in another section of the agreement and reads thus: "That just as soon as iron ore is found in sufficient quantities to justify the shipping of the same;" and that same thought is incorporated in the section that I have just read; so that it is an agreement or acknowledgment on their part, that there is a sufficient quantity of iron ore to justify the mining and shipment of that quantity per annum; and, the defendants having failed to comply with that part of the agreement, that is, having failed to surrender up to these plaintiffs all their rights under this agreement, the admission exists in this cause, and the burden is cast upon the defendants to show by preponderance of evidence, that the iron ore did not exist in sufficient quantities to justify the mining and shipment of it.   [This raises the only real question of fact for the jury to determine; which is, whether or not, from all evidence in the case, there existed, or there exists in these premises, sufficient quantity of iron ore that would have justified or will justify, these defendants to mine and ship annually that quantity;] [3] and in your delibera-

tions upon the evidence bearing upon that question, you must take into consideration the acknowledgment that exists in this agreement, by virtue of the defendants failing to surrender their rights under the agreement prior to July 1, 1884.

On that question a great deal of testimony has been taken; first, on the part of the defendants to prove the non-existence of the iron ore, in sufficient quantities which would justify their mining and shipping it. On the other hand, testimony has been taken by the plaintiffs in rebuttal, tending to show the existence of iron ore in these premises. As we have already said to you, the question of fact for you to determine in the case is, whether or not iron ore exists in these premises in sufficient quantities, which would justify the defendants to mine and ship it, at the rate of 2500 tons per annum. [We further say to you, that the $1,200 which is the stipulated royalty in the agreement for the 2500 tons payable as we have stated, is not a penalty. It is the price of 2500 tons of iron ore in place; that is, if the iron ore fails, the price is not payable. If there was no ore to mine, there would be no royalty to pay. This is the language of the Supreme Court on the subject, in Muhlenberg v. Henning, 116 Pa. 138.] [4]

Now, referring to the testimony upon the question of the existence of this iron ore, you must take into consideration . with it all the circumstances surrounding this tract of land. The evidence shows that it is an ore-bearing region; that there are furnaces in the neigborhood; you have heard the names of the different furnaces mentioned. [It has been owned by the McCahans, and their father before them, for a number of years, and, during all that time, so far as the evidence shows, up to the time of making this agreement, the McCahans themselves had not developed the iron ore, or had it worked as an ore property, except a lease which was testified to by John McCahan, that he and a man by the name of Kinney had shipped in the neighborhood of about 500 tons or or along there from this property.] [5]

The evidence on the part of the defendants, testified to by themselves, and by a number of witnesses, among whom were Mr. Holmes, Mr. Fulton, Mr. Stewart and Mr. McClenahan and a number of others; the defendants, or one of the defendants at least, testifies that he had shafts sunk upon this prop-

erty, one or more, in the spring of 1884; that he went upon the premises in company with General Lane, his co-partner and that Mr. Thomas McCahan went with them upon the land; that they found a number of old shafts sunk; that they all had the appearance of having been abandoned for years; that the surface indications did not indicate the presence of any quantity of iron ore; and the shaft that they sunk produced or discovered no quantity of iron ore; that they have since taken experts upon the premises who have examined the character of the ore-bearing clay, and who have searched and made examinations around and about the old shafts that were sunk, but they failed to discover any quantity of iron ore. There were indications of some ore, but not in sufficient minable quantities to warrant or justify parties to undertake to ship 2500 tons annually. In this connection you have the testimony of Mr. Stewart, a gentleman of very extensive experience in the iron business, who relates his information upon that subject; he has lived there for a great many years, very near to these premises; you have heard his testimony in regard to the examinations that he made, and the result of it was, that he failed to find or discover that iron ore existed there in any quantity.

[On the other hand, you have in reply to this testimony, what the plaintiffs and their witnesses say in regard to it. First, as to the plaintiffs themselves, who testified as we have already stated to you, that about 500 tons of iron ore had been mined and shipped from this property, prior to the making of this agreement. That a person mined that ore under a contract with John McCahan and Mr. Kinney, if I remember the testimony correctly, who testified that he had sunk a shaft and that he found a five foot vein of iron ore in the premises; but after finding it there, after having sunk his shaft and developed it a little while, he quit. Well why did he quit? It is argued by counsel for the defendants and their interpretation of it is, that he quit because ore did not exist in sufficient quantity to justify its mining and shipment. The witness testifies that he quit twice; first, because royalty was too high, being $1.00 a ton; that it was afterwards reduced to 50 cents, and he quit the second time because he was stopped from loading his cars at the wharf of The Cambria Iron Co. Does that explanation satisfy you

why he quit? or did he quit because of the insufficient quantity of ore? ] 6   The plaintiffs, if I remember their testimony correctly, do not testify that this quantity of iron ore does exist in the premises.   You have heard their testimony and from it you must determine as well as you can the existence or the non-existence of iron ore, in the quantity required by the agreement, which would warrant and justify the parties of the second part to ship annually that quantity.   You have the testimony of the geologist, Mr. Scott, who says that this farm is geologically situated in the ore-bearing belt, but he does not undertake to say to you whether or not the iron ore does exist in a sufficient quantity to justify this annual shipment of 2500 tons; and it is very plain that no man without an examination of the ore itself, could testify to its actual existence.   It requires examination and discovery of its existence before it is certainly known.   You have also the testimony of Mr. McHugh, a very intelligent and experienced gentleman in the iron ore business; a man of extensive information, and he does not state that iron ore does exist in this land in that quantity. He says it is impossible to tell for this reason, a reason which is also assigned by others, that this is a hematite ore, and it does not lie in stratified form, that is, in its original bed. That its existence there might be accounted for by the ore having been washed there, or by the upheaval of the rock; that it may lie in one place in large or small quantities, and then it may disappear and be found again somewhere else, and that it is impossible to discover its existence except by practical tests.

Now, take the tests that have been made from all the evidence and determine whether or not this iron ore exists in sufficient quantity to justify these parties to mine and ship this amount of 2500 tons annually.   If the weight of the evidence satisfies you that it does so exist, then these defendants are liable to pay the royalty of $1200 with interest on it, as it is claimed in this suit.   But if, after a full, fair and conscientious consideration of all the evidence in the case, you are satisfied by the weight of the evidence that it does not exist in that quantity, so as to justify these defendants to mine and ship the same according to this agreement, then your verdict should be for the defendants.   [If the iron ore does not exist there it,

would be very unfair to ask these defendants to pay for it; if it does exist, then it is their contract obligation to pay for it. In your examination and consideration of this evidence, you begin with the admission contained in this agreement; then examine the evidence and see if this is rebutted by the testimony of the defendants, and in this connection you must also consider the plaintiffs' testimony to determine the simple question as to whether iron ore exists or does not exist in sufficient quantities to warrant the mining and shipping of 2500 tons annually; as you determine that question, so your verdict should be, either for the plaintiffs for the amount of damages claimed, or for the defendants generally.] [7]

The verdict of the jury was returned in favor of the defendants. A rule for a new trial having been discharged, judgment was entered on the verdict, when the plaintiffs took this writ, and assigned as error:

1–7. The parts of the charge embraced in [ ] [1 to 7]

8, 9. The admission of defendants' offers. [8] [9]

*Mr. R. Bruce Petrikin* (with him *Mr. M. M. McNeil*), for the plaintiffs in error:

Our nine assignments of error may be resolved into two propositions:

1. There was nothing for the court to leave to the jury but a direction to find a verdict for the plaintiffs for the sum of $1,200, with interest from February 1, 1885. This was refused and we think it is the duty of this court, as we believe upon an inspection of the record it will be their pleasure, to reverse this judgment and, without a new venire, direct judgment to be entered for the plaintiffs.

By the lease, the defendants agreed to push on and prosecute vigorously the work of digging and prospecting for iron ore, and if they did not quit possession and surrender on or before July 1, 1884, the very act of refusing or neglecting was to be an agreement on their part that there was a sufficient quantity of iron ore on said property to pay the royalty on February 1, 1885. They did not dig; they did not prospect; they did not develop, nor did they surrender. Yet upon the authority of Muhlenberg v. Henning, 116 Pa. 138, the court

Arguments.

admitted expert testimony to show the non-existence of ore, quoting from the words of the opinion in that case, "If there was no ore to mine, there could be no royalty to pay." But that case is to be distinguished; the lessees had expended $3,000 to develop the ore, and the option to terminate the lease was in the lessor. Here no expenditure was made to develop and the option to terminate the lease was in the lessees. Moreover, the utter worthlessness of expert testimony in such cases is shown in Krum v. Mersher, 116 Pa. 25.

2. When the court undertook to leave to the jury the question of the existence or non-existence of iron ore, on the leased premises, it should have been done so fairly, and the duty of the defendants to dig and prospect and thoroughly develop, as the means of discovering the existence of the ore, should have been fully explained.

The witnesses all agreed and so did the court below, that the land lay in the ore belt of the Juniata hematite ore. And the plaintiffs proved in rebuttal the existence of ore in sufficient quantities to be mined profitably, but, without referring to the three witnesses so testifying, by name, the court in the charge gave undue prominence to the testimony of the plaintiffs' expert witnesses, and adopted the interpretation of the evidence urged by the defendants' counsel in argument, which was error: Bughman v. Byers, 10 Cent. R. 605. Moreover, the jury were told that a solemn covenant, binding between the parties, to pay a royalty of $1,200 on February 1, 1885, if they retained possession and did not surrender a ten years lease, was simply an acknowledgment, not absolute or conclusive, but casting the burden on defendants to show the non-existence of iron ore. It would seem strange that a solemn covenant engagement should be treated as so simple a matter, and that parties, bound to fulfil their contract obligations, may do nothing in the way of performance.

*Mr. R. M. Speer* (with him *Mr. J. R. Simpson*), for the defendants in error:

1. The verdict below being for the defendants, no judgment for the plaintiffs can be entered here. Such a judgment, being without any verdict to support it, would want a legal foundation for it and would therefore be erroneous: Robinson v Myers, 67 Pa. 9; Morris v. Ziegler, 71 Pa. 450.

2. The action is not brought on the covenant to push on and prosecute vigorously the work of digging and prospecting for iron ore, and it is not averred in the narr that upon any kind of labor by the defendants at developing the land, sufficient quantities of ore to justify shipping could be found.

3. The clause upon which the action is said to be brought to recover the royalty of $1,200, contains this provision: " If the said parties of the second part continue to operate said lease for three months after February 1, 1885, it is an acknowledgment," etc. But if there were no ore to mine, for what should royalty be paid? The contract obligation ceased when it became manifest that no ore in sufficient quantity for mining and shipping existed: Muhlenberg v. Henning, 116 Pa. 138; Ridgway v. Sneyd, 1 Kay 627; Mays v. Dwight, 82 Pa. 542; Miles v. Stevens,. 3 Pa. 21; Kemble C. & I. Co. v. Scott, 90 Pa. 344; Kemble I. Co. v. Scott, 15 N. W. 220.

OPINION, MR. JUSTICE PAXSON:

We are asked not only to reverse this case without a venire, but also to enter a judgment for the plaintiffs. Just how we are to do this in view of the fact that there was a verdict for the defendants below, we are not informed. There is the further difficulty that this was an action of covenant, and the narr is not printed in the paper book of plaintiffs in error as required by the rules of court. We do not know, therefore, with any certainty, what breaches of covenant were assigned, nor what the issue was in the court below. We might guess at it, but that is not our province.

We would hesitate to reverse a case so defectively presented and might well affirm the judgment for this reason. A careful examination of it as presented,.however, fails to disclose any substantial error. It is true the learned judge below fell into a slight inaccuracy in that portion of his charge in which he said that "no other covenant preceding this one required them to develop the iron ore." This, however, was entirely harmless, as the entire covenants in the lease were submitted to the jury in a manner free from objection. If the defendants' witnesses are to be believed there was not ore enough on the property to justify the defendants in expending any money upon it. There was also evidence that within the time limited the

defendants abandoned the property and so notified the plaintiffs. It was immaterial that the notice was given to the attorneys of plaintiffs, as one of the plaintiffs admitted, when upon the witness stand, that he had been informed of the notice by the attorney in question. Under these circumstances no question of the authority of the attorney arises, and the plaintiffs' repudiation of it is not material.

Nor do we think the court committed any error in its construction of that part of the agreement which refers to the failure to give up possession of the premises by July 1, 1884, as evidence that there was sufficient ore on the premises to pay the royalty. The learned judge held this not to be conclusive, but an admission which threw the burden of proof upon the defendants to show that there was not ore there in paying quantities. The defendants assumed this burden and succeeded in convincing the jury that the ore was not there. And if it was not there, the plaintiffs could not be required to pay the royalty, under Muhlenberg v. Henning, 116 Pa. 138, and other cases there cited.

Judgment affirmed.