## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

VIRGINIA IRON, COAL AND COKE CO. V. GRAHAM AND OTHERS.

March 13, 1919.

Absent, Kelly and Burks, JJ.

1. MISTAKE AND ACCIDENT—*Assumption of Existence of Facts Which Are Non-Existent.*—Where certain facts assumed by both parties are the basis of a contract, and it subsequently appears that such facts did not exist, there is no agreement.

2. MINES AND MINERALS—*Exhaustion of Mineral—Liability for Royalties.*—Mining leases frequently contain a provision for the release of the lessee from payment of rents or royalties in case the mineral becomes exhausted or is found not to exist in paying quantities, and in such case the happening of such contingencies releases the lessee. Even in the absence of such · a provision, it is usually held that a lessee on a royalty basis is released from payments if the mineral becomes exhausted, or is found not to exist in paying quantities, although the lease provides that he shall take out and pay royalties on a certain amount each year, or that the royalties shall not be less than a fixed amount per year, for by such an undertaking the lessee contracts for promptitude and thoroughness in taking out existing mineral. But where the lessee retains possession he is not relieved of liability for the fixed rental, or royalty based on minimum production.

3. MINES AND MINERALS—*Exhaustion of Mineral—Liability for Royalties.*—Where the lease provides for the payment of rent irrespective of product and whether the mine is worked or not, which is termed a dead or sleeping rent, the lessee cannot be relieved from payment of the rent because the mineral proves not to be worth the expense of working, because mineral is not found in paying quantities, or even because the mine supposed to exist develops no mineral at all, and such rent is payable even after the mine is exhausted.

4. CONTRACTS—*Impossible Contract.*—If one makes a contract to do a thing which is in itself possible, he will be liable for a breach of the contract, notwithstanding it is beyond his power to perform it. But where, from the nature of the contract itself it is apparent that the parties contracted on the basis

of the continued existence of the substance to which the contract related, a condition is implied that if performance becomes impossible because that substance does not exist, this will and should excuse such performance.

5. MINES AND MINERALS—*Exhaustion of Ore—Liability for Royalties—Case at Bar.*—In the instant case, it appeared clear that the main purpose of the contract was to mine iron ore, the existence of which in quantities great enough to justify the continuance of mining operations for forty years was assumed as a fact by both parties, and by its express language the lessor was to receive fifty cents per long ton as compensation, "for each ton of good merchantable ore mined and shipped." The lease also provided that "not less than twenty thousand tons to be shipped each year."

*Held:* That the contingency provided against was the failure to mine and not the exhaustion of the ore which both parties assumed to exist, and, therefore, upon proof that the ore does not exist, the lessee should be relieved of its obligation to pay the royalty provided for in the lease.

6. RESCISSION, CANCELLATION AND REFORMATION—*Mistake—Jurisdiction of Equity.*—Equity has jurisdiction to decree cancellation or rescission of an instrument because at the time of its execution either one or both of the parties labored under a mistake of fact, if the mistake affects its very substance, and is not a mere incident or inducement for entering into it.

7. CONTRACTS—*Mistake.*—If certain facts are assumed by both parties as the basis of the contract, and it subsequently appears that such facts did not exist, the contract is inoperative.

8. RECISSION, CANCELLATION AND REFORMATION—*Mining Lease—Exhaustion of Ore.*—In the instant case, a suit for cancellation of a mining lease, both parties assumed that iron was upon the land in sufficient quantity to justify its operation for at least forty years. The production of iron ore and the payment to the lessor of the royalty on such ore was the very substance of the contract. It appeared that the parties were grossly mistaken as to the quantity of the ore. The mistake was mutual, and as a consequence thereof there was a substantial failure of the consideration.

*Held:* That while the lessee was not bound to go into a court of equity and could have made its defense at law, if sued by the lessor, it was under no obligation to await the institution of such an action. The existence of the lease and the possibility of having to assume the very large liability thereby imposed, constituted a contingent liability, the tendency of which would be to impair its credit. In the instant case it appeared also that there were liens on the property, the holders of which ought to be heard before action was taken affecting the property.

9.  EQUITY—*Jurisdiction—Mistake—Failure of Consideration—Adequate Remedy at Law.*—Both failure of consideration and mutual mistake are grounds of equity jurisdiction. In order to justify the court in refusing to take such jurisdiction the remedy at law must be adequate; for if at law it falls short of what the party is entitled to, that founds a jurisdiction in equity. And it must be complete; that is, it must attain the full end and justice of the case. It must reach the whole mischief and secure the whole right of the party in a perfect manner, at the present time and in future; otherwise equity will interfere and give such relief and aid as the exigencies of the particular case may require.

10.  EQUITABLE DEFENSES—*Section 3299 of the Code of 1904—Relief in Equity.*—Failure to make an equitable defense allowed under section 3299 of the Code of 1904, in a common law action, does not preclude a subsequent proceeding in equity for such relief.

Appeal from a decree of the Corporation Court of city of Roanoke. Decree for defendants. Complainant appeals.

*Reversed and remanded.*

The opinion states the case.

*W. B. Kegley, Jackson & Henson* and *D. D. Hull, Jr.,* for the appellant.

*Stuart B. Campbell, Robert Sayers, Waller R. Staples* and *Eppa Hunton,* for the appellees.

PRENTIS, J., delivered the opinion of the court.

The briefs herein filed are unique in that (either purposely or inadvertently) counsel have observed Rule II (120 Va. v, 94 S. E. vi). This rule requires the briefs to contain a concise abstract or statement of the facts admitted and controverted, which are disclosed by the record. When fairly observed, the precise questions involved are manifest and much subsequent labor for the court and counsel will be thereby avoided.

The facts here to be considered are: that by indenture of December 31, 1897, David P. Graham and wife demised unto Carter Coal and Iron Company for forty years from January 1, 1898, that certain iron ore property in Wythe county, Virginia, known as "Cedar Run," theretofore granted to Graham by Franklin Carter and wife, said to contain about 3,600 acres, with the right during the term to mine and remove all the iron ore which the lessee might or could mine on these lands, with certain easements and privileges fully set forth in the instrument. By deed of January 27, 1899, Carter Coal and Iron Company conveyed unto Virginia Iron, Coal and Coke Company (appellant, hereinafter called the lessee), together with other property the rights and privileges granted by the said lease. Theretofore, on October 1, 1898, the Carter Coal and Iron Company executed a deed of trust to the Continental Trust Company of the city of New York, conveying the leased property and privileges to secure a bond issue of $2,000,000. The New York Trust Company has succeeded the Continental Trust Company as trustee in that conveyance. On February 23, 1899, the lessee (Virginia Iron, Coal and Coke Company) conveyed the leased estate, together with much other property, to the Manhattan Trust Company, trustee, to secure a bond issue of $10,000,000. David P. Graham, the original lessor, having died, his successors in title, Nannie M. Graham, his widow, and others (hereinafter called the lessors), on May 13, 1903, modified the lease so as to reduce the minimum quantity of ore required to be shipped from 20,000 tons to 12,000 tons per annum. A partial partition of the real estate of the original lessor has been made, whereby the rights of his widow and heirs to participate in royalties under the lease are fully set forth and established by conveyance of August 20, 1904.

The original lease fixed a royalty of fifty cents per long ton (N. & W. Ry. Co. or its successor's weight) for each

ton of good merchantable ore mined and shipped from the leased premises, to be paid to the lessor on or about the 25th days of April, July, October and January of each year for the ore shipped the preceding three months, with the following provisions as to minimum : "Not less than twenty thousand tons to be shipped each year. 'If less is shipped, royalty is to be paid on twenty thousand tons, and if more than twenty thousand tons are shipped in one year, and less than that quantity in the next preceding or succeeding year, the surplus of the one year, and the royalty paid thereon, may be carried to the credit of the other year, either preceding or succeeding, to make the required minimum. If the minimum quantity is not shipped in any year or paid for in sixty days after the expiration of the year, or if the ore shipped is not paid for in sixty days after the rent therefor is due, the said David P. Graham, his heirs, representatives, or assigns, may terminate this lease on ten-days' notice of intention so to do." And the following clause: "The said David P. Graham, his representatives, heirs or assigns, or their agent, may enter the property at any time for the purpose of inspecting the mining operations and of requiring the same to be carried on in a proper way, and with due regard to the rights of each party." The lessee is given the right to remove, at the end of the term, all tramways, machinery and appliances, all pipes, sluices and troughs, and everything used in connection with the mining and washing operations, except the houses and the timber used as supports in the mines, and except pipe lines, tramways and washing plant which were there prior to October 1, 1897. Provided, however, that nothing put on the property by the lessee for use in mining and washing operations shall be removed until the rents are paid; and the privileges and easements granted are to be enjoyed in the operation of the mines leased. The mine had been in operation prior to the date of the lease, and was operated at that time.

The Carter Coal and Iron Company took possession and continued to operate the mine until it conveyed its rights to the Virginia Iron, Coal and Coke Company, and thereafter the last-named company continued to operate it until July 25, 1916, upon which date it gave written notice to Nannie M. Graham and others, the lessors, of the cancellation or surrender of the original lease of December 31, 1897, to become effective as of September 1, 1916. The reason therefor stated in the notice was that iron ores could no longer be found on the leased premises, either of the quality or in the quantity that could be profitably mined, the cost of such tonnage as could be gotten out being altogether prohibitive. The lessors replied to this notice August 29, 1916, advising that they intended to hold the lessee strictly to the terms of the contract, and conceded no authority to cancel it.

The lessee, in accordance with such notice, ceased operations upon the leased premises, has abandoned possession thereof for all the purposes of the lease, though it has not removed its property therefrom, has paid all royalties accrued up to the date designated for the cancellation and surrender to become effective, and has not since that time occupied the property or exercised any of the privileges granted by the lease. After the attempted cancellation and surrender, the lessee undertook to remove from the leased premises the machinery, rails and equipment placed thereon by its predecessor, which, under the terms of the lease, it had the right to remove upon its termination, but under threat of proceedings by the lessors to secure an injunction, has for the present abandoned its claim of right to remove such property. It seems that this allegation of threatened injunction proceedings is made in an amendment to the bill, and that this threat was made after the institution of this suit. The cancellation and surrender of the lease has been ratified by the board of directors of the lessee,

88

and the deed of release tendered to the lessors with the bill and amended bill.

The lessee, on January 30, 1917, filed its original bill, and thereafter filed an amended bill against Nannie M. Graham and others, successors in title to the original lessor, and the trustees in the deeds of trust referred to, setting forth these facts and praying for a decree canceling the lease, permitting it to remove its personal property from the premises, enjoining the lessors from prosecuting any actions for the recovery of royalties under the lease and for general relief. The lessors, defendants, filed their demurrer and answer, and the trial court sustained the demurrer and dismissed the bill. Of this action the lessee is here complaining.

Fairly stated, the demurrer is based upon two grounds:

1. That the bill and exhibits filed show that the contract between the parties is a contract of hazard, that the risk as to the quantity and quality of ore was assumed by the lessee, and that this appears from the lease itself; that it also appears therefrom that it is a definite contract, under seal, for the rental of the property for forty years, including the right to the lessee to mine ore and do certain other things on the land; that the consideration of the lease is a sum certain as rent reserved; and that there is no warranty on the part of the lessors that the ore will be found of any particular quantity or quality, and, hence, that the existence or non-existence of such ore in any quantity or of any quality is immaterial.

2. That even if the lessee is entitled to be relieved from paying the royalty on account of exhaustion of the ore in the premises, a court of equity has no jurisdiction to grant such relief upon the ground that the complainant has a complete and adequate remedy at law.

The trial court sustained the demurrer upon the ground last stated.

(a) Taking up these grounds in the order in which we have just stated them, we come to consider, whether the bill is demurrable upon the ground that the contract was one of hazard as to the lessee.

The question is quite an interesting one, and we have been greatly enlightened by the exhaustive briefs of the learned counsel on both sides. While no precisely similar question has ever been decided in Virginia, we have been referred to many cases in other jurisdictions, and the principles involved seem to be fairly well established.

[1] As to contracts in general, this is said in 13 Corpus Juris, p. 376: "Where certain facts assumed by both parties are the basis of a contract, and it subsequently appears/ that such facts did not exist, there is no agreement." And many cases are cited in support of that general statement.

[2, 3] Applying this to mining leases, this is said in 27 Cyc., p. 718: "Mining leases frequently contain a provision for the release of the lessee from payment of rents or royalties in case the mineral becomes exhausted or is found not to exist in paying quantities, and in such case the happening of such contingencies releases the lessee. Even in the absence of such a provision, it is usually held that a lessee on a royalty basis is released from payments if the mineral becomes exhausted, or is found not to exist in paying quantities, although the lease provides that he shall take out and pay royalties on a certain amount each year, or that the royalties shall not be less than a fixed amount per year, for by such an undertaking the lessee contracts merely for promptitude and thoroughness in taking out existing mineral. But where the lessee retains possession he is not relieved of liability for the fixed rental, or royalty based on minimum production. Where the lease provides for the payment of rent, irrespective of product and whether the mine is worked or not, which is termed a dead or sleeping rent, the lessee cannot be relieved from payment

of the rent because the mineral proves not to be worth the expense of working, because mineral is not found in paying quantities, or even because the mine supposed to exist develops no mineral at all, and such rent is payable even after the mine is exhausted." Citing many authorities.

A most interesting and instructive note upon the subject of the intervening impossibility of performance of a contract as a defense, is found in Lawyers' Reports Annotated, 1916F, at p. 10. Ancient and modern cases involving both mining leases and other contracts are there gathered and analyzed.

In a comparatively recent English case, *Krell* v. *Henry* (1903), 2 K. B. 740, 72 L. J. K. B. N. S. 794, 89 L. T. N. S. 328, 19 Times L. R. 711, 52 Week. Rep. 246, this language, which seems to be particularly pertinent to the case in judgment, is used: "But, on the other side, it is said that the condition or state of things need not be expressly specified, but that it is sufficient if that condition or state of things clearly appears by extrinsic evidence to have been assumed by the parties to be the foundation or basis of the contract, and the event which causes the impossibility is of such a character that it cannot reasonably be supposed to have been in the contemplation of the contracting parties when the contract was made. In such a case, the contracting parties will not be held bound by the general words, which, though large enough to include, were not used with reference to a possibility of a particular event rendering performance of the contract impossible. I do not think that the principle of the civil law, as introduced into the English law, is limited to cases in which the event causing the impossibility of performance is the destruction or non-existence of something which is the subject matter of the contract, or of some condition or state of things expressly specified as a condition of it. I think that you first have to ascertain, not necessarily from the terms of the contract,

but, if required, from necessary inferences, drawn from surrounding circumstances recognized by both contracting parties, what is the substance of the contract, and then to ask the question whether that substantial contract needs for its foundation the assumption of the existence of a particular state of things. If it does, this will limit the operation of the general words, and in such case, if the contract becomes impossible of performance by reason of the non-existence of the state of things assumed by both contracting parties as the foundation of the contract, there will be no breach of the contract thus limited. * * * Each case must be judged by its own circumstances. In each case one must ask one-self, first, what, havng regard to all the circumstances, was the foundation of the contract? Secondly, was the performance of the contract prevented? Thirdly, was the event which prevented the performance of the contract of such a character that it cannot reasonably be said to have been in the contemplation of the parties at the date of the contract? If all these questions are answered in the affirmative. * * * I think both parties are discharged from further performance of the contract."

[4] If one makes a contract to do a thing which is in itself possible, he will be liable for a breach of the contract, notwithstanding it is beyond his power to perform it. But where, from the nature of the contract itself it is apparent that the parties contracted on the basis of the continued existence of the substance to which the contract related, a condition is implied that if performance becomes impossible because that substance does not exist, this will and should excuse such performance. *Walker v. Tucker,* 70 Ill. 527.

The case of *Muhlenberg* v. *Henning,* 116 Pa. 138, 9 Atl. 144, is strikingly like this case. There was a five-years lease in which the lessees covenanted to pay thirty-five cents a ton

for every ton of merchantable ore mined, and to mine at least 1500 tons annually during the term, or, in default thereof, to pay a royalty of $525 annually; and that the lease should be forfeited at the option of the lessors, if at the end of each year at least $525 as rent or royalty had not been paid. In an action to recover unpaid royalty for two years, an affidavit of defense was filed, averring that, though the defendants had operated the mines in a workmanlike and skillful manner for about nine months, yet, on account of the non-existence of sufficient ore and its inferior and unmerchantable quality, they were unable to continue. It was held that the affidavit exhibited a good defense to the action, and the court there distinguished such a lease from those involved in the cases which were there and are here relied upon to support a contrary view, notably *Jervis* v. *Thompson,* 1 Exch. (H. & H.) 195, and *Marquis of Bute* v. *Thompson,* 13 M. &. W. 486, in both of which cases the contracts were construed to import an absolute covenant to pay the rent whether the mines could be made to produce the mineral or not.

In Williston on Sales, sec. 661, it is said: "It is probable that the tendency of the law is towards an enlargement of the defense of impossibility, and in any case where it may fairly be said that both parties assumed that the performance of the contract would involve the continued existence of a certain state of affairs, impossibility of performance due to a change in this condition of affairs will be an excuse." And this, in Bishop on Contracts (2d ed.), sec. 588: "Where, by the intent of the parties, the continued existence of a specific subject matter is essential to the performance of the contract, its destruction will operate as a discharge where neither of the parties have assumed such risk." In *Mineral Park Land Co.* v. *Howard,* 172 Cal. 289, 156 Pac. 458, L. R. A. 1916 F, 1, it is said that "Where performance depends upon the existence of a

given thing, and such existence was assumed as the basis of the agreement, performance is excused to the extent that the thing ceases to exist, or turns out to be nonexistent." Citing Beach Contr., sec. 217; 9 Cyc. 631.

This is said in *Boyer* v. *Fulmer*, 176 Pa. 282, 35 Atl. 235: "It is perfectly manifest that the parties contracted entirely with reference to iron ore which was supposed to exist, and did exist, on the land demised. The lessee was to use all proper efforts to find ore, and, if found, to mine and take it away, and to take out at least enough in each year to yield $400.00 annually, and if he did not take out that much he was bound to pay $400.00 annually in any event; but, of course, this obligation proceeded upon the assumption that the ore was there, and continued to be there, in sufficient quantities to enable the lessee to perform his contract in this respect. If the ore was not there at all, so that it could no longer be taken out in such quantity, the lessee was not bound to pay for it. He could not do an impossible thing, and, therefore, could not be held liable for not doing it. Neither the lease nor the contract is a sale of the ore in place for a definite minimum sum, as was the case in *Timlin* v. *Brown* [158 Pa. 606, 28 Atl. 236]."

*Ridgley* v. *Conewago Iron Co.* (C. C.), 53 Fed. 988, construes a mining lease which required the lessee to mine at least four thousand tons annually, and to pay therefor a fixed sum per ton, or, in case he failed to take out such quantity, to pay therefor. It was held that the lease imposed no obligation to pay the minimum royalty after the ore in the premises had become exhausted. There Dallas, circuit judge, said: "Mining leases commonly include, in addition to the usual undertaking to pay for what may be actually mined, a covenant that some fixed or ascertainable sum at least shall be annually paid. These covenants are not all the same, or to the same effect. They may be divided into two classes—first, those which require the pay-

ment of rent irrespective of product; second, those which require that upon failure to take out a stipulated quantity, royalty with respect thereto shall nevertheless be paid. When the covenant is of the first class, the defendant is liable for the rent, even if nothing could be gotten by mining. When the covenant is of the second class, his obligation is to pay for the stipulated quantity whether mined or not, not whether it exists or not. ⌐He contracts for promptitude and thoroughness in mining, not for the productiveness of the mine.⌐ *Lord Clifford* v. *Watts*, L. R. 5, C. P. 577; *Muhlenberg* v. *Henning*, 116 Pa. 138, 9 Atl. 144. This covenant is of the second class."

The general rule, substantially as stated by Judge Dallas, is recognized in the following cases: *Diamond Iron Mining Co.* v. *Buckeye Iron Mining Co.*, 70 Minn. 500, 73 N. W. 507, 19 Mor. Min. Rep. 197; *Brooks* v. *Cook*, 135 Ala. 219, 34 So. 960, 22 Mor. Min. Rep. 456; *Blake* v. *Lobb's Estate*, 110 Mich. 608, 68 N. W. 427, 18 Mor. Min. Rep. 462; *Hewitt Iron Mining Co.* v. *Dessau Co.*, 129 Mich. 590, 89 N. W. 365, 22 Mor. Min. Rep. 111; *Gribben* v. *Atkinson*, 64 Mich. 651, 31 N. W. 570, 15 Mor. Min. Rep. 428; *Muhlenberg* v. *Henning*, 116 Pa. 138, 9 Atl. 144, 15 Mor. Min. Rep. 423; *McCahan* v. *Wharton*, 121 Pa. 424, 15 Atl. 615, 16 Mor. Min. Rep. 239; *Bannan* v. *Graeff*, 186 Pa. 648, 40 Atl. 805; *Scioto Fire Brick Co.* v. *Pond*, 38 Ohio St. 65; *Adams* v. *Washington Brick, Lime & Mfg. Co.*, 38 Wash. 243, 80 Pac. 446; *Hiller* v. *Walter Ray & Co.*, 59 Fla. 285, 52 So. 623, 20 Ann. Cas. 1162; *Fritzler* v. *Robinson*, 70 Iowa 500, 31 N. W. 61; *Bloomfield Coal & Min. Co.* v. *Tidrick*, 99 Iowa 83, 68 N. W. 570; *Edwards* v. *Trinity B. V. Ry. Co.*, 54 Tex. Civ. App. 334, 118 S. W. 572; *St. Louis S. W. Ry. Co. of Texas* v. *Johnston*, 58 Tex. Civ. App. 639, 125 S. W. 61; *Williams* v. *Miller*, 68 Cal. 291, 9 Pac. 166; *Min. Park Land Co.* v. *Howard*, 172 Cal. 289, 156 Pac. 458, L. R. A. 1916-F, 1; *Carr* v. *Whitebreast Fuel Co.*, 88 Iowa 136, 55 N. W. 205.

There are other cases which cannot be reconciled with this view, though some of them may be distinguished. There is a line of cases in which the lessee has been required to pay the minimum royalty, notwithstanding the exhaustion of the mine, if he continues in possession of the leased premises claiming under the lease. *Vandalia Coal Co.* v. *Underwood,* 55 Ind. App. 99, 101 N. E. 1047; *Lehigh & Wilkes-Barre Coal Co.* v. *Wright,* 177 Pa. 387, 35 Atl. 919; *N. Y. Coal Co.* v. *New Pittsburgh Coal Co.,* 86 Ohio St. 140, 99 N. E. 198; *McDowell* v. *Hendrix,* 67 Ind. 513.

Then, in *Lehigh Zinc Co.* v. *Bamford,* 150 U. S. 665, 14 Sup. Ct. 219, 37 L. Ed. 121Þ, it is held that where the right to mine ore in the premises was not the substantial inducement for the lease, and the covenant to pay a fixed royalty as rent per year is not qualified, the lessor is not released even if the mineral is exhausted. Then there are cases where it is said that the amount of mineral was known to the parties at the time the lease was entered into, and the contract was for the sale and purchase of such mineral. *Timlin* v. *Brown,* 158 Pa. 606, 28 Atl. 236; *Bute* v. *Thompson,* 13 M & W. 487, 153 Eng. Rep. 202; *Jervis* v. *Tompkins,* 4 Week. Rep. 683.

[5]    Applying these principles to the bill and lease here involved, it appears clear that the main purpose of the contract was to mine iron ore, the existence of which in quantities great enough to justify the continuance of mining operations for forty years was assumed as a fact by both parties, and by its express language the lessor was to receive fifty cents per long ton as compensation, "for each ton of good, merchantable ore mined and shipped." The subject and substance of the contract is merchantable iron ore, to be mined and shipped, and the obligation is to pay therefor, or to pay such royalty on the minimum quantity which both parties assumed could be so produced. This language in the lease confirms this view:   "Not less than twenty thousand

89

tons to be shipped each year. If less is shipped, royalty is to be paid on twenty thousand tons, and if more than twenty thousand tons are shipped in one year, and less than that quantity in the next preceding or succeeding year, the surplus of the one year and the royalty paid thereon may be carried to the credit of the other year, either preceding or succeeding to make the required minimum." How is it possible for the lessee to receive the benefit of these credits unless the ore exists? The contingency provided against was the failure to mine and not the exhaustion of the ore which both parties assumed to exist. It is manifest, then, that if the facts alleged in the bill can be proved, and the ore does not exist, the lessee should be relieved of its obligation to pay the royalty provided for in the lease, because the paramount consideration of the contract has failed, and performance thereof by the lessee has become impossible. Cases relating to the general subject could be added, but those referred to which construe the contracts involved as we have construed the contract under review are so convincing, so securely rest upon right reason and justice, that additional citations are unnecessary. This, as we understand, is the view which the trial judge entertained, but he sustained the demurrer because of opinion that the defense could and should be made at law.

[6]   (b) This brings us to the second ground of demurrer.

Equity jurisdiction to decree cancellation of an instrument because at the time of its execution either one or both of the parties labored under a mistake of facts is well recognized. 4 R. C. L. 506.

In *Briggs* v. *Watkins*, 112 Va. 26, 70 S. E. 555, this is quoted from *Mowatt* v. *Wright*, 1 Wend. (N. Y.) 355, 19 Am. Dec. 508: "An error of fact takes place either when some fact really existing is unknown, or some fact is supposed to exist which does not exist."

In *Lee* v. *Laprade*, 106 Va. 597, 56 S. E. 720, 117 Am. St. Rep. 1021, 10 Ann. Cas. 303, in which it was held that a court of equity had jurisdiction to rescind a deed for a plain mistake which was material in its character and of the very substance of the transaction—that is, that the lot conveyed was a part of a public street—this is quoted from 4 Min. Inst. (4th ed.) 697: "In cases of plain mistake or misapprehension, though not the effect of fraud or contrivance, equity will rescind the conveyance, if the error goes essentially to the substance of the contract, so that the purchaser does not get what he bargained for, or the vendor sells that which he did not design to sell."

It is clearly settled that relief may be had in equity for the cancellation or rescission of a contract if the mistake affects its very substance, and is not a mere incident or inducement for entering into it. The subject is discussed in a comprehensive note to *Steinmeyer* v. *Schroeppel* (226 Ill. 9, 80 N. E. 564, 10 L. R. A. [N. S.] 114), 117 Am. St. Rep. 228.

In the note to *Miles* v. *Stevens*, 3 Pa. 21, in 45 Am. Dec. 632, this is stated: "No principle of equity is more firmly settled than that relief will be granted from the consequences of a mistake of fact, provided that such mistake is in reference to a fact material to the transaction, and was not occasioned by the parties' own neglect of a legal duty. There is no doubt of this general rule. The great difficulty arises in applying it to the multiform circumstances attending various kinds of transactions. A mistake of fact may arise in two ways, either in reference to the subject matter of the contract, such as its situation, value, extent, boundaries, amount, and so forth, or in reference to its terms, as where the mistake consists in reducing a verbal agreement to writing. It may be either a mistake as to a fact past or present, arising from unconscious ignorance or forgetfulness, or a mistake occasioned by a belief in the past

or present existence of a fact. Under all circumstances, in order to obtain equitable relief, the mistake must have been unintentional." Citing a number of cases.

[7] If certain facts are assumed by both parties as the basis of the contract, and it subsequently appears that such facts did not exist, the contract is inoperative. *Fink* v. *Smith,* 170 Pa. 124, 32 Atl. 566, 50 Am. St. Rep. 750; note, *DuBois Borough* v. *DuBois City, Etc. Co.,* 176 Pa. 430, 35 Atl. 248, 34 L. R. A. 92, 53 Am. St. Rep. 682; *Bluestone Coal Co.* v. *Bell,* 38 W. Va. 307, 18 S. E. 493; *Laing* v. *Price,* 75 W. Va. 192, 83 S. E. 499; *Coffinberry* v. *Sun Oil Co.,* 68 Ohio St. 488, 67 N. E. 1069; *Long* v. *Inhabitants of Athol,* 196 Mass. 497, 82 N. E. 665, 17 L. R. A. (N. S.) 96.

[8] The question at issue is whether this contract comes within this doctrine. As to this we have no doubt whatever. Both parties assumed that iron was upon the land in sufficient quantity to justify its operation for at least forty years. The production of iron ore and the payment to the lessor of the royalty on such ore was the very substance of the contract. Assuming the allegations of the bill to be true, as we must upon this demurrer, it is clear that the parties were grossly mistaken as to the quantity of the ore. This mistake was mutual, and as a consequence thereof there is a substantial failure of the consideration. While the lessee was not bound to go into a court of equity and could have made its defense at law, if sued by the lessor, it was under no obligation to await the institution of such an action. The existence of the lease and the possibility of having to assume the very large liability thereby imposed, constituted a contingent liability, the tendency of which would be to impair its credit. If that action had been postponed, the lessee would have been left with a contract of vast importance outstanding, with impending litigation, and the consequent uncertainty as to whether the claim would be adjudged valid or invalid. The court of law

could not either require a cancellation of the lease, or in that action adjudicate questions which may arise affecting the rights of the parties as to the property upon the leased premises.    The bill and exhibits also show that there are two outstanding deeds of trust upon the property securing large bond issues, and only a court of equity could conclude and determine the rights of those claiming thereunder, for a common law court would be powerless to do so.    It is not inconceivable that these trustees and the bondholders they represent may differ with the lessee as to the value of the privileges granted by the lease, and before any action affecting the property upon which they have a lien is taken, they have the right to be heard.

[9, 10]    If the facts alleged are true, the lessee is entitled to relief in equity upon the ground of failure of consideration arising out of mutual mistake, and both failure of consideration and mutual mistake are grounds of equity jurisdiction.    In order to justify the court in refusing to take such jurisdiction, the remedy at law "must be adequate; for, if at law, it falls short of what the party is entitled to, that founds a jurisdiction in equity.    And it must be complete; that is, it must attain the full end and justice of the case.    It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and in future; otherwise, equity will interfere and give such relief and aid as the exigencies of the particular case may require."    1 Story's Eq. Jur., sec. 33; *Stuart* v. *Pennis,* 91 Va. 688, 22 S. E. 509; *Southern Ry. Co.* v. *Franklin, Etc., R. Co.,* 96 Va. 704, 32 S. E. 485, 44 L. R. A. 297. Even if sued at law, the lessee would not be bound to make its equitable defense, which is allowed under Code, section 3299, for it is expressly provided by section 3300 that failure to make such defense in the common law action does not preclude a subsequent proceeding in equity for such relief, and the statute is thus construed in *Selden* v. *Williams,* 108 Va. 551, 62 S. E. 380.

The discussion could be prolonged, and many other authorities are cited in the briefs, but those to which we have referred are sufficient. We are convinced that the trial court erred in sustaining the demurrer. A decree will, therefore, be entered here overruling it, and the cause will be remanded for trial upon the issues of fact tendered by the answer.

*Reversed and remanded.*